# THOMAS F. COLLINS and JOHN H. COLLINS v. IOWA HARRELL et al., Appellants.

### In Banc, April 13, 1909.

1. **SPECIFIC PERFORMANCE: Partition: Trial by Jury.** Where defendant in the suit for partition, by her interplea and answer, sets up a contract between herself and the intestate by virtue of which she asserts ownership in the land and asks for the specific performance of the contract, the cause is not triable by a jury, but by the court.

2. ———: **Oral Agreement to Convey Land: Character of Proof.** In a suit to specifically perform an oral agreement, made by the deceased intestate in his lifetime, to give land to his wife's nine-year old niece, the contract itself must be definite and specific for the conveyance or devising of the specific land in suit, and the proof of the contract must be cogent, clear and convincing.

   *Held*, by WOODSON, J., dissenting, that if any tolerance at all is to be given to a suit to specifically perform an oral contract to convey or devise land, the rule which abates the letter of the Statute of Frauds should operate alike on both parties; and if the promises and innuendoes made by the landowner are sufficiently specific and definite as to cause the minor to believe, and the members of her family and friends to believe, she was working for and in consideration of his promise to give her a farm, then, when he receives her services under that promise, the courts should not hesitate to hold the promise was sufficiently definite and certain to bind the landowner also.

3. ———: ———: ———: **To Educate and Support.** Statements by an aged man, who was the owner of four farms, made on the day his wife died, leaving him no child or other descendant, to her nine-year-old niece, who with her mother had been members of his household for eight years, that "You are not going to leave me now in my bereavement; stay with me and I will school you and educate you and give you all your clothes; you live with me and I will see that you have plenty," and accepted by her and by her mother for her, and fully performed on her part, fall far short of an agreement to convey to her 152 acres of land specifically described in the petition; and though he often afterwards expressed a purpose to make provision for her out of his property, and at times declared his intention to give her the specific land, yet the contract made was specifically performed by him, and the subsequent expressed intention cannot be referred to it.

*Held*, by WOODSON, J., dissenting, that the testimony shows that the contract was not only to support and educate her and provide a home for her, but to give her the specific farm sued for, and that purpose was fortified by a definite and fixed intention through the rest of his life to give her the farm, not as a donation, but in fulfillment of his agreement and in consideration of her faithful services.

4. ————: ————: ————: **Testimony of Mother.** After the mother had testified at great length that the agreement of the deceased intestate with her nine-year-old daughter was to educate and support her through life, she testified for the first time that, after the arrangement was made in the presence of others and assented to, she and deceased went into the house, and he said to her that "he had made up his mind to give" to the child his "Queen City Farm," the land sued for. *Held*, that this testimony was of an unsatisfactory character, and some deference should be extended to the chancellor who pronounced it such; but on its face it was not the language of an irrevocable contract, but a mere declaration of intention which he might abandon.

*Held*, by WOODSON, J., dissenting, that the mother's delay in testifying that deceased had said he had made up his mind to give her the Queen City Farm was due to the interference and interruption of counsel, and her testimony should not be looked upon with a wry or sour eye on that account, and coming so soon after the promise made to the child in the presence of others should be considered as a more definite amplification and as a part of the agreement.

5. ————: ————: ————: **Expressions of Intention.** Expressions of affection and fondness by deceased for his niece who lived with him, and of an intention to make provision for her, though often repeated, do not measure up to a statement of an existing irrevocable contract to convey or devise to her a specific farm, and are unsatisfactory evidence from which to make out a case of specific performance.

*Held*, by WOODSON, J., dissenting, that a fixed and definite purpose, often expressed and running through years, to give her the farm, are referable to the agreement out of which the affectionate relations grew, a part of which was that he would give her the farm.

6. ————: ————: ————: **Interested Witnesses: Deference to Chancellor.** Where the evidence to establish the existence of the oral agreement to convey land consisted of the testimony of the mother, uncle and aunt of the nine-year-old girl with whom it is claimed the agreement was made, and of the testimony of other parties who were seeking in other suits to

Collins v. Harrell.

prove up like verbal claims against the estate, the testimony was peculiarly for the consideration of the trial judge who heard the witnesses testify.

*Held,* by WOODSON, J., that there being no testimony whatever that the claims of the other witnesses were unjust or that the various witnesses had entered into a conspiracy to aid each other, and nothing that militates against their credibility, their testimony should not be looked upon with suspicion.

7. ————: ————: ————: Performance: Referable to Contract.  The performance of an oral contract to convey land must be unequivocal and must be referred alone to the very contract sought to be performed.  And where it is charged that the deceased intestate, whose wife had just died, leaving him no child, made a contract with his wife's nine-year-old niece to give her a certain farm, if she would live with him and comfort him until his death, and where the evidence shows that her mother was a widow without a home of her own, that they had made their home with him for years, and that he was kind and generous to them and fond of them and enjoyed their society, it cannot be said that they would have refused to continue to make their home with him unless he had stipulated to convey the child a farm, and their continuing to live with him and sharing his bounty, without other compensation, is not clearly referable to the contract.

*Held,* by WOODSON, J., dissenting, that the evidence shows he was a generous and liberal-minded man; that he had no children of his own or other descendants; that he possessed a large estate, and was an old man; that he had grown very fond of his wife's nine-year-old niece and was fond of her young mother; that he made the agreement to give the farm, of his own motion, when he was deprived of the companionship of his wife; and that the agreement was both a natural and commendable one, and their performance of it is referable to it.

Appeal from Schuyler Circuit Court.—
*Hon. Nat. M. Shelton,* Judge.

AFFIRMED.

*Henry C. Taylor* and *C. C. Fogle* for appellants.

The sundering of natural ties and the formation of artificial ones for the enjoyment and gratification of the party at whose instance this is done, is held and

ought to be held to be such a consideration as the courts will recognize as valuable where the other party has in good faith acted on and carried out the agreement on his part. This is upon the principle that the parties cannot be put *in statu quo*. In the very nature of things nine years in the life of a child so change conditions that it is out of the power of an earthly tribunal to restore the parties to their original situation and environment, and the courts therefore compel them to stand upon and abide by the record they have made. Healy v. Simpson, 113 Mo. 341. It devolves upon the defendant, Iowa Harrell, to prove her contract pleaded with clear, satisfactory and unequivocal evidence. This we contend she has fully done. The evidence shows that Caleb Collins said, "Now, you agreed to stay with me if I would give you the Queen City farm." This contract is definite and clear. The evidence clearly and forcibly shows that the mother of Iowa Harrell was about to take her and go and live with her brother, and on the moment of her getting ready to go, Caleb Collins said to Iowa Harrell, "You are not going to leave me now". The evidence shows that she remained with him under the terms of the contract, and that all of her acts thereafter were done pursuant to the terms of the contract and were referable to it alone. The evidence shows that Caleb Collins was a badly afflicted old man, and that he had no women folks about the house except this girl and her mother, and that they performed all of the household duties, cheerfully and freely. The evidence shows that he had not given them anything, and that he was a man of wealth. We submit that Iowa Harrell has made out her case according to the law and evidence in such case, and that she is entitled to the Queen City farm, but if she should not get it, then what? All the services that she has rendered for said Caleb Collins goes for naught and the brothers and sisters, nieces and nephews come in and take the property of the said Caleb Collins, they take it all, and

leave her nothing.  The agreement is further confirmed by the acts of Mr. Collins, during a period of seven or eight years in holding the plaintiff out to the world as his daughter, and is also confirmed by the daily life of these parties for the same length of time.  In addition to the performance of the household duties, she was obedient and affectionate, she gave him those little attentions which are expected from children by parents in the household and for many years she was the only companion this old man had, remaining with him after the death of his wife, until his death, performing and discharging every duty, requested by him, faithful to the last, never for a moment believing but what he would carry out the promise that he made.  The fact is she did not know but what he had already deeded her the Queen City farm, she did not learn of the fact that he had not until after his death.  Mr. Collins performed his duty towards Iowa faithfully and she performed hers faithfully.  Now is there any reason why a court of equity should not do that thing which death prevented Caleb Collins from doing?

*Payne & Sowers* and *Higbee & Mills* for respondents.

(1)  The oral contract pleaded by Iowa Harrell was not proved with any certainty.  Kirk v. Middlebrook, 201 Mo. 289; Rosenwald v. Middlebrook, 188 Mo. 58; Kinney v. Murray, 170 Mo. 674; McElvain v. McElvain, 171 Mo. 244.  All the evidence tending to prove the alleged contract comes from interested parties, most of whom have claims pending against the estate, earmarked with fraud and collusion, and rests almost exclusively upon the repetition by them of declarations and admissions made by Caleb Collins, who is now dead.  There is an utter absence of such definiteness and clearness as to the terms of the contract as the law requires.  One witness has it that Collins would give her the farm, another

that he would clothe, educate her and allowed to do more for her; on the other hand, Collins frequently talked of selling the farm, and Mrs. Harrell urged him to sell, and when Collins said he had thought of giving it to her and Babe, Mrs. Harrell said she would not have it if she had to live on it. From a consideration of all the evidence, it seems clear that Collins never made any definite contract to give Iowa this or any other tract of land. Mrs. Harrell so understood it when she learned Collins had made no will. She was a stenographer; had worked in a lawyer's office; Collins had been a justice of the peace; both must have known the importance of a written contract and either of them could have prepared a contract, yet there is not a scrap of writing to support the alleged contract. (2) There is no evidence that either Mrs. Harrell or Iowa ever sacrified anything in remaining with Collins. She and Iowa had a home there from the time Iowa was eleven months old; she had an interest in the poultry, which is no small thing, Collins paid her bills at the hospital and constantly aided her with money; he clothed, supported and educated the child, and when, in April, 1902, she thought she could do better, she removed to Kansas to educate Iowa and get her into better society, leaving Collins "to totter down the hill" alone. Elmore Israel's evidence shows this was a breach of the contract, if one was ever made. Collins understood it was an effort to force him to make over his property to them. When Mrs. Harrell's health failed, she and Iowa found a good home with Mr. Collins, where her aged and paralytic father also found an asylum. In our opinion, the preponderance of the evidence indicates that Mrs. Harrell expected Collins would remember her and Iowa in his will, but despite their efforts, he made no will, and she then declared she and Babe would get nothing. Land titles would be very insecure, if under the evidence, the court had granted the prayer of the interpleader. Rosenwald v. Middlebrook, 188 Mo. 92;

Kinney v. Murray, 170 Mo. 703.  (3)  Mrs. Harrell was a party to the alleged contract, and was an incompetent witness.  She was not a competent witness, either as a party to the contract or as agent for the daughter, to state the terms of the contract.  Asbury v. Hicklin, 181 Mo. 658.  (4)  The petition does not allege that the contract was entered into by Collins with some one capable in law of making a contract for the child, but pleads a contract with the minor herself.  McElvain v. McElvain, 171 Mo. 253.  If such contract was ever entered into, it must, of course, have been between the mother and the deceased, who were the only parties having the legal capacity to make such a contract. Kinney v. Murray, 170 Mo. 703.  (5)  There is no averment of explanation in her pleadings of her abandonment of the Collins home in 1902.  It is not alleged that she and her mother removed to Kansas with Collins' consent for the purpose of giving Iowa an education and getting her into better society.  They did not return until Mrs. Harrell's health failed, and both were ever afterwards charges upon the bounty of Collins. Teats v. Flanders, 118 Mo. 668.

GANTT, J.—This is a suit to partition 152 acres of land in Schuyler county and eighty acres of land in Macon county, Missouri.  The suit was brought in the Schuyler Circuit Court.  The plaintiffs and the defendants are the collateral kindred of Caleb Collins, who died intestate, without widow or issue, in Davis county, Iowa, on August 11, 1905, in which last-mentioned county he owned at the time of his death about five hundred acres of land. At the trial the defendants Albert Collins, Ira Collins, James Collins, Edward Collins and Sarah Gibson filed a joint answer disclaiming any interest in the land in suit.  Iowa Harrell, a minor, on motion of her guardian, was made a defendant and filed a separate answer claiming title to the 152 acres of land in Schuyler county, and known in the record as

"The Queen City Farm," by virtue of an alleged oral contract entered into by and between her and Caleb Collins in his lifetime, in the summer of 1898, when she was less than nine years old, to the effect that if she, the said defendant, would live with him, the said Caleb Collins, stay with him and comfort him until his death, he would give, transfer and convey to her all of the said Schuyler county land above described in consideration therefor. That she accepted said proposition on the part of Caleb Collins and contracted and agreed with the said Caleb Collins to live with him, to stay with him and comfort him until his death, and in pursuance of said agreement, she did live with him and stay and comfort the said Caleb Collins from the time the said agreement was entered into until his death and fully performed the said agreement on her part; that the said Caleb Collins died August 11, 1905, by reason of which said contract and the performance thereof by the defendant the said real estate situated in Schuyler county, Missouri, was owned absolutely by this defendant; that the said Caleb Collins failed and neglected to keep his part of said contract prior to his death and failed to convey, transfer or deed said land to this defendant, and that the plaintiffs herein and the other defendants have no interest in said land. Wherefore she prayed the court for a decree declaring her to be the absolute owner of said real estate and to divest all the title and interest of the plaintiffs and the other defendants in and to said tract of land in Schuyler county, Missouri.

Thomas R. Hollingsworth, a minor, by his guardian *ad litem* prayed the court to strictly protect his interest.

The plaintiffs in reply to the answer of Iowa Harrell denied all of the allegations therein and for further reply stated that the alleged pretended promise and contract of the said Caleb Collins pleaded in said defendant's answer to give, transfer and convey the said

land to the said defendant, if ever made, was not in writing, signed by Caleb Collins.

The case was tried at the November term, 1905, without the intervention of a jury, though the defendant and interpleader, Iowa Harrell, demanded a jury. As her interplea and answer stated a cause in equity for the specific performance of an alleged contract, the issue was not triable before a jury and the court properly refused a jury.

To sustain her claim to the land in question, the defendant introduced her mother, Mrs. Maggie Harrell, who testified that she was forty-six years old and that the defendant Iowa was her only child. The witness was married in March, 1878. Iowa Harrell was born in 1889. Caleb Collins married the sister of the witness and the witness lived with Mr. and Mrs. Collins until witness was married in 1878. Mr. Harrell died in 1890. After the death of her husband, the witness and the defendant, Iowa, went to the home of the deceased, Caleb Collins, where they continued to reside as members of the family until the death of Mrs. Collins in 1898, save and except a portion of that time witness was away settling up her husband's business. In April, 1902, after Mrs. Collins's death, the witness bought a small hotel at Leroy, Kansas, took her goods and moved there, taking the defendant, Iowa, with her for the purpose of giving her a better education and getting her into better society. Witness was for a time a stenographer in a lawyer's office, but her health failed and she and her daughter returned to the Collins home in Iowa, where they made their home until Mr. Collins's death in 1905. During all of this period Caleb Collins gave them a home, clothed and gave them half of the produce and cared for them and sent Iowa to school and paid their medical bills. Caleb Collins became greatly attached to Iowa and on frequent occasions remarked that he intended doing something for her and on several occasions stated that he intended to

give her the Queen City farm.  Mrs. Collins died August 24, 1898, and it was on this day that the alleged contract upon which defendant claims the land in suit was entered into.  At that time she was less than nine years old.  From that day until Caleb Collins's death some seven years later, Mrs. Harrell made her home with him except the short time she resided in Kansas.  She could recall but four conversations with him wherein he mentioned giving Iowa the Queen City farm.  The first of these conversations occurred on the day of her sister's funeral in the yard of Mr. Collins's residence. She and her brother, Zeke, and his wife and Caleb Collins were standing in the yard talking, Iowa was playing with her cousins, thereupon the witness, Mrs. Harrell, said to Iowa, ''We will get our things and go home with brother Zeke and make our home.''  Mr. Collins said, ''No.''  Iowa was in the yard and he went up to her and said, ''You are not going to leave me now in my bereavement and leave me here alone,'' and he began to cry, and the little girl sympathized with him, she ran to him and put her hands in his hands, and he said, ''No, Iowa, stay with me and I will school and educate you and give you all your clothes.  You live with me and I will see that you have plenty.''  And then Iowa put her hands in his, and said: ''I am going to stay with Uncle.''  And then the two went off in the house together.  On cross-examination she gave this version of that conversation, speaking of Mr. Collins: ''Cale said, 'You are not going to leave me now when I am in so much trouble.  She is all I have got.' ''  On re-direct examination she stated it in this way: ''Cale said if Babe stayed with him until he died he had made up his mind to give her the Queen City farm.''

Mrs. Ezekiel Dooley, the wife of Mrs. Harrell's brother, detailed this conversation in this way: ''I remember Mr. Collins came up and said to her, she was not going to leave him, and commenced to cry.  The

little girl went up to him and took him by the hands and he said, 'Babe, you are not going to leave me, you are all I have got now.' He talked on and said if she would stay he would always see that she had a home and he would school her, that is about all." The second conversation occurred about six months later. She stated that he went on doing for her, we stayed there with him and he said that he had made up his mind to give her the Queen City farm. That she was to stay with him and take care of him until the last, or as long as he lived. On cross-examination, she restated it in these words: "Cale said I have made up my mind to give Babe the Queen City farm." "We were talking about the home place that we lived on in Iowa and the two farms that he owned and he said he had concluded to give her the Queen City farm. He thought it would be better on account of the wood being there than the one we lived on." The following question was propounded to the witness: "Q. Now, what, if any, condition did he couple with giving her the Queen City farm, what did he say she would have to do after that? A. She would have to stay with him as long as he lived." When asked what Iowa said, she answered, "She said she would do it. She never gave a word of inclination that she wanted to leave him." The next conversation occurred on one occasion when Ezekiel Dooley was visiting at Mr. Collins's. It was during the World's Fair at St. Louis. Zeke's daughter was with him. This conversation was in the presence of the witness, Mrs. Harrell, Iowa and Ezekiel. She said "Iowa wanted to go to school in St. Louis and stay with Ezekiel. Cale said to her, 'You know you agreed to stay with me if I would give you the Queen City farm', and Iowa said, 'Yes,' and told him she wanted to go, but she would stay with him for that." On cross-examination she stated this conversation thus: "Zeke was in the east room with Cale, and witness went in to listen. Cale

said to Iowa, 'Babe, I cannot do without you. Stay with me and go to school at Stiles another year. You know you promised to stay with me if I would give you the Queen City farm,' and she said, 'Yes.' Q. Cale said, 'I cannot do without you, Babe, I promised to give you the Queen City farm and I want you to stay?' A. Yes, sir; when she persisted, she said, 'Yes, I would like to go with my little cousins.' He said, 'You know you ought to stay with me. I promised to give you the Queen City farm.' "

Ezekiel Dooley gave this version of that conversation: "Cale said, you know, Iowa, I told you I would give you the Queen City farm if you would stay with me to the last," and she said, "Yes." "Now," he said, "I want you to stay," and then he talked like he would make some disposition for another winter; that he might have some place to send her to school.

The fourth conversation occurred in October, 1904. Caleb Collins, the deceased, and Mrs. Harrell, were preparing to go to Bloomfield; she says that he had gotten out his tax receipts and placed some land numbers on a piece of paper. He told her not to let him forget to take them to town with him as he intended having his lawyer write a deed to Iowa. He said, "I want to fix it for Iowa Harrell for the way she took care of me; that he would take care of it as long as he lived and then it would be hers." They went off to town, however, without taking the numbers of the land, and neither thought of it until their return home.

This is the substance of the four conversations which Mrs. Harrell testified to. Only three of these occurred in the presence of the defendant, Iowa, and in only two of them did he address his conversation to her directly.

Ezekiel testified that he had a talk with Caleb Collins in the summer of 1903, wherein Collins told him he intended giving Iowa the Queen City farm, and that he " 'lowed to do more than that for her."

At the trial Mrs. Harrell produced, over the objections of the plaintiff, an unsigned typewritten letter, which she testified Caleb wrote on her typewriter the day he was taken down sick in his last illness. That paper is in this form:

"Stiles, Iowa, July 28th, 1905.

"Mr. Carruthers,

"Dear Sir:

i wnt to give away a pice of land,

sssssssssssssssssssssssssssssssssssssssssssssssssssssssssss

bbbbbbbbbbbb    mmmm,,,,,  ....'  ,,,,,)c (( | cxzvbbb

mmmmmmm b,b,b,b,b,,,,,,,,,,. . . . . .. . . . . .

mmm,m,m,m,mkm,m,m,m,m,m,

qwertyuiopqwertyuiopysss mmsssssm ddgfgfgfddmbbb

gh kl 8z zxcvbn sssssssssssssssss

qwertyuiopqwertyuiopzxcvbnm,.ikjhgfdsa wefthyujhtg

"Stiles, Iowa, July 29th, 1905.

"S. S. Carruthers,

    Bloomfield, Iowa.

"Dear Sir:

"I want to give away a piece of land, what consideration should I put on it, the value of the land, or will one dollar or five dollars, be as good, I want it to be legal, and I want to know what will make it so, please let me hear from you and oblige.

"Respectfully yours,

"CALEB COLLINS."

This letter she says she kept in her safe to which Iowa carried the key. She said nothing about it to the administrator, although she endeavored to get them to give Iowa the land in question. Mrs. Harrell was a stenographer, had worked in a lawyer's office, was acquainted with legal terms, and knew who Mr. Collins's attorney was. It will be observed that the letter does not specify what land he desired to give away, or to whom he desired to give it.

W. A. Rinehart testified that he was at the Collins home and endeavored to buy this farm. Collins in the presence of Mrs. Harrell and the interpleader priced the land at $25 per acre, and said he had talked about giving that particular piece of land to a young lady that they had there at the house, he called her Iowa or Babe. This was in October, 1902. Iowa was present when he said he thought he would give it to her, that is all he said. He said that he thought a great deal of her and was giving her an education and was greatly interested in her, and he told her to sit down and play on the organ and she did. I do not remember that he said he had deeded the land to her but he said he would give it to her.

W. D. Masterson testified that Mr. Collins told him he had given Iowa a calf and now it was a cow and she had two calves, that he was going to deed her the farm or give her the farm, he did not say which, witness did not pay much attention to it. Witness asked Mr. Collins why he did not sell the Queen City farm and he replied that land was raising in price and if he sold he would have to look around for more land.

George Melvin, a justice of the peace of Lancaster, Missouri, testified that he knew the deceased, Caleb Collins, very well; that in the spring or winter before the trial, the deceased came to Lancaster and called at his office and said to him, "I want to make a deed, but I do not care to have anybody know my business or to make it public." He said he wanted to make a deed to a girl that he had raised or a woman. I do not think he called her name. Witness was about to write the deed when Mr. Collins asked witness if he knew that he, Collins, was living in Iowa, he would probably want to make a deed to some land in Iowa, and Melvin asked him, "Where have you got to have this deed recorded?" and he said, "Bloomfield, Davis county." Thereupon Melvin told him that he had better get somebody else to make the deed; that a justice of the

peace in Missouri could not take the acknowledgment. And he asked what officer had the seal and witness told him a notary public or one of the clerks of the court, and then Collins left and that was all there was to it. Witness did not write the deed, he did not say where the land was, but said the deed would have to be recorded at Bloomfield, Iowa.

James Collins, one of the defendants in the partition suit who signed the disclaimer in the answer, testified that he was a nephew of Caleb Collins, and was frequently at his house during the last six or seven years and he heard Caleb talk about the Queen City farm. Collins said to him, "Jim, I want to see Sam Carruthers, to see about making a deed, I told them I promised Iowa the Queen City farm, and I want to make a deed to it so that they cannot beat her out of it." This conversation occurred in February, 1903. He spoke about building a house on this land, wanted to fix it up for Iowa. On cross-examination this witness stated that he also had a suit then pending in the district court of Davis county, Iowa, in which he claimed that Caleb Collins had made an oral gift of a farm of one hundred and seventy-two acres to him, known as the Savannah farm. And that he expected on the trial of that case to have Mrs. Maggie Harrell and Iowa Harrell as witnesses for him.

John W. Cooksey testified that Caleb Collins said to him in 1904, "I am going to fix her so she won't have to work when I am gone." That he was going to deed her the Queen City farm.

Mrs. Stella Dooley testified that she was Zeke Dooley's wife, and that she heard Caleb Collins say he was going to give Iowa this Queen City farm and fix up a house on it for her. "Q. Did he say how he was going to give it to her? A. No, sir. Q. Did he say anything about deeding it to her? A. No, sir." She also testified to the conversation in the yard on the day of Mrs. Collins's funeral. She heard him say to Iowa

she was not going to leave him, and commenced crying. And he talked on and said if she would stay he would always see that she had a home and he would school her, that was about all. He did not say he had given her the farm but said he was going to do it. Iowa was not present at this conversation.

B. B. Burchett testified that he lived at Bloomfield, Iowa, and had been sheriff four years, knew Mr. Collins in his lifetime and was intimate with him; had a talk with him about the Queen City farm; he talked about this young lady, said she was the sweetest child he ever knew, she could not be any closer to him if he had been her father, he was proud of her; said she had a lady's head on her shoulders, and he was going to school her and make a lady of her so that any body would be proud of her. When she was in Kansas he spoke of going out there to make his home with them. I was at his house and he spoke of a couple of land-buyers having come from Missouri to buy the Queen City farm, and said he thought it would make Iowa more money for him to sell that farm and invest it in Iowa lands, but he said, "Recently Missouri land is enhancing in value and I am not sure but that it will come up to ours here." He went to see Mr. Collins twice while he was sick. The first time he just dropped in and Mr. Collins said, "I knew Bern would run in here, I knew he would come to see me." He was rather emotional and tears ran down from his eyes. He made me promise to come back. I went back and I took him some wine. I think I took a bottle of Old Quaker liquor. At the request of one of the Collinses I asked him if his business was in the condition in which he wished it to be. One of them asked me to do this, said I could do it better than anyone else, so I said to Mr. Collins, "Cale, we do not think you are going to die or anything worse is going to happen, but we cannot always tell what might occur and the boys wanted me to ask you if your business was in the condition in which you desired

it to be?" and he said, "No, it is not. I want to make a deed to Iowa to a piece of land, and I want to make a will." He said he had told Sam Caruthers what he wanted to have him make and he wanted to have him make a will the next time he came out. I think he said he had written him. I won't be sure he had written him in regard to it or whether he told me he told him about it. I told him I am going right to Bloomfield and will send Caruthers right down if you say so, and he said, "I am too weak, sick and nervous to-day, if he was here I do not know as if I could sign my own name. I am awfully weak. But hold yourself in readiness, so if I don't get any better—Ira told me I would be much better tomorrow—if I do not I will 'phone you to have Caruthers come down." The witness told him he would deliver the message. The next time he heard from him he was dead. It was Jim Collins who requested him to see Caleb Collins in regard to fixing his estate.

On the part of plaintiffs, the evidence tended to show that in a suit for the partition of the lands of Caleb Collins in the district court of Davis county, Iowa, among his heirs at law, the witness James Collins had pleaded that he was the owner of and entitled to a tract of the said lands, amounting to 172 acres, by reason of a sale of said tract to him by Caleb Collins for services rendered said Caleb Collins by said James Collins, and that said Caleb Collins had not conveyed the same to him and he prayed for a decree of specific performance thereof, which cause was then pending in said court. Plaintiffs also offered in evidence the record of a suit by Ezekiel Dooley v. Caleb Collins to quiet the title to certain lands as against a certain mortgage executed by Obediah Dooley to Caleb Collins and a decree accordingly.

Hybarger, a witness for plaintiffs, testified that he was in the real estate business in Centerville, Iowa, and had been since 1893; that in 1902, he accompanied

W. A. Burkhart and E. A. Duckworth to the residence of Caleb Collins. That he and Duckworth went into the house and witness inquired of Caleb Collins if the Queen City farm was for sale and his price. Collins said he hadn't put it on the market; that if he was going to sell his price would be $30 or $35 an acre. Witness thought the price too high and told Collins he had better consider it, that maybe the money would pay him more than the farm. Defendant, Iowa, and her mother were present. Mrs. Harrell said he had better sell, the farm had never brought more than enough to pay the taxes and repairs. Collins said he did not care to sell then, but she urged him and he said, "I didn't know but that I would want to give it to Babe and you sometime for a home." Mrs. Harrell said she did not want it if she had to live on it as a home. Burkhart was not in the house during this visit.

J. W. Cooksey, being recalled, testified that he had filed a claim of $1,200 against estate of Caleb Collins, covering a period for 1891 to 1905, inclusive, for work and labor done, and the same was then pending.

There was other evidence to the effect that after the death of Caleb Collins, Mrs. Harrell only claimed two cows and a calf and a mare as belonging to Iowa. Also evidence that Mrs. Harrell had stated to different witnesses that if Caleb had not left a will she and Iowa would get nothing. Also that Mrs. Harrell had told LeGrand he ought to buy the Queen City farm; that Mr. Collins was not able to look after it and could loan his money to better advantage.

I. As already seen, this is a bill in equity on the part of Iowa Harrell to enforce the specific performance of a verbal agreement on the part of Caleb Collins in his lifetime to convey the 152 acres of land, specifically described in her interplea and answer, and lying in Schuyler county and known in the record as the Queen City farm, to said Iowa Harrell. The circuit

court denied the relief prayed for in said interplea and answer, and defendant Iowa Harrell has appealed to this court. Caleb Collins was nearly eighty years old at the time of his death in 1905. He had no children. His wife died in 1898. Mrs. Maggie Harrell was a sister of Caleb Collins's wife. Mrs. Harrell had one child, Iowa Harrell, the defendant. Doctor Harrell, the father of Iowa, died in 1890. Prior to her marriage in 1878 to Doctor Harrell, Mrs. Maggie Harrell lived in the family of Caleb Collins, as a member thereof. After her husband's death Mrs. Maggie Harrell and her child, Iowa, again became members of the family of Caleb Collins, and were living with him when his wife died. Caleb Collins had been and was a successful business man. He had become the owner of three or four farms in Davis county, Iowa, aggregating about five hundred acres, and two farms in Missouri, of which the Queen City farm in Schuyler county was one. He was a man of considerable education. Had taught school and been a merchant in his younger days. He seemed to have been a man of note and influence in his neighborhood. He maintained his mental vigor up to his death. He seemed to have been a generous man and was very fond of defendant, Iowa, who had lived with him from the time she was nine years old until she was about sixteen at the time of his death. During all the time, beginning with the death of Doctor Harrell, up to the death of Caleb Collins, except the few months Mrs. Harrell and Iowa lived at Leroy, Kansas, Caleb Collins furnished Mrs. Harrell and Iowa a home, free of charge, clothed them and paid their medical bills, sent Iowa to school and gave Mrs. Harrell, for her pin money, one-half the eggs, chickens, etc. They seemed to have entertained a strong affection for him, and he became greatly attached to Iowa. He always expressed interest in her welfare and there can be little doubt that he not only purposed to make a provision for her out of his property but repeatedly announced

his intention to do so. With this preliminary statement of the relations existing between Caleb Collins and Iowa Harrell prior to August 24, 1898, the date of the funeral of the wife of Caleb Collins, we come to the averments of the interplea or equitable answer of defendant Iowa in this case, to-wit: "That shortly after the death of the said Caleb Collins's wife, the said Caleb Collins contracted and agreed with this defendant that if this defendant would live with him, stay with him, and comfort him until his death, he would give her all of the Schuyler county land above described in consideration therefor;" that this defendant accepted said proposition and agreed to live with him, stay with him and comfort him until his death, and in pursuance of said agreement she did live and stay with him and comfort him until his death and fully performed her part of said contract, but that said Caleb Collins failed and neglected to keep his part of said contract prior to his death and failed to convey the same to her. The time when this alleged specific arrangement was made is fixed in the testimony as the day of the funeral of Mrs. Collins, and the promise made that day by Caleb Collins to Iowa is the one upon the faith of which Mrs. Harrell abandoned her expressed intention of taking her things, leaving the house of Caleb Collins, and making her home with her brother, Ezekiel Dooley, and it was on this occasion that the testimony on the part of Iowa tends to establish her acceptance of Caleb Collins's proposition, for it is then that she put her hand in his and said, "I am going to stay with Uncle," and went into the house with him and thereupon Mrs. Harrell abandoned her intention of making her home with her brother. Now, the testimony as to the promise of Caleb Collins is variously stated as follows: "He, Caleb, said: 'You are not going to leave me now in my bereavement and leave me here alone? No, Iowa, stay with me and I will school you and educate you and will give you all

your clothes. You live with me and I will see that you have plenty;' and to this she replied, 'I am going to stay with Uncle.' ''

It is too plain for discussion that if this were all the testimony it utterly failed to sustain the averments of the answer as to an agreement to convey *this specific real estate*. There was no reference by either party to the *land* which the defendant claims she was to have conveyed upon her staying with him, as long as he lived. Mrs. Ezekiel Dooley in her testimony gave this conversation in practically the same words. She says that Caleb Collins said, "If she would stay he would always see that she had a home, he would school her, that is about all."

Ezekiel Dooley was present but he did not testify to this contract alleged to have been made that day. It is significant that after Mrs. Harrell had been examined and cross-examined and re-examined until her testimony covered forty-five printed pages, she had never stated that Caleb Collins had mentioned this real estate. Finally, counsel for defendant Iowa again re-examined her, and requested her to repeat again *the conversation that took place up at the house immediately after the death* of Mrs. Collins. Up to that time she had invariably stated the alleged agreement was made in the yard. She had been asked again and again to state the place, time and substance of each conversation she had or had heard in which Caleb Collins referred to this matter and had never mentioned a conversation in the house; and she stated that after we were in the house, "we were talking in the south room and he said *he had made up his mind to give Iowa the Queen City farm.*" Counsel, *"That is not what I want.* What else did he say, if anything?" Ans. "If she stayed with him he would give her the Queen City farm." Q. "How long did he say for her to stay?" "Ans. Until the last, until he died." On her previous examinations, she had been pressed by counsel for

plaintiffs to state anything else that Caleb had said, and she had repeatedly testified that she had stated all that he had said. Obviously counsel for defendant was not satisfied with her testimony, as up to this time she had completely failed to sustain the averment as to this real estate. She had testified to an arrangement which all the evidence establishes had been fully complied with by Caleb Collins. This long belated testimony as to the Queen City farm was only forthcoming after the question of counsel had suggested *a new place and a different time,* and then the answer was that Caleb had said "he had made up his mind to give Iowa the Queen City farm," and this also being unsatisfactory, counsel stated this was not what he wanted, as obviously it was not. Then for the first time, in response to a call for something more, she answered, "If she stayed with him he would give her the Queen City farm." Then came the suggestive question: "How long did he say for her to stay with him?" and the answer, "As long as he lived." Previous to this she had stated that after the talk in the yard, nothing more had been said about the matter for about six months. No other witness testified to this statement in the house. When it was made the mutual agreement in the yard had been consummated. To this last voluntary statement, which was that he had made up his mind to give Iowa the Queen City farm if she stayed with him until the last, or his death, there is no pretense that there was any assent or agreement on the part of Iowa. It was wholly *ex parte* and the mother does not state that thereupon she agreed that they would remain. The court was made to understand that the alleged contract in the yard had proved satisfactory and its performance begun when all parties adjourned from the yard to go to dinner and that the proposed removal to Ezekiel's had been abandoned.

In Kinney v. Murray, 170 Mo. l. c. 701, the principle governing courts of equity in this class of cases

was well stated to be that: ''When, as in this case, and in consonance with this doctrine, a court of equity is called upon to establish and enforce a contract of this character, in the teeth of the Statute of Wills, and of the Statute of Frauds and Perjuries, and to set aside the disposition of valuable property made in conformity with the requirements of those statutes, there is devolved upon the chancellor the gravest responsibility, perhaps, that ever attaches to his high office. And nothing short of the inherent justice of the claim, supported by evidence that can be relied upon with the utmost confidence, proving the existence of the contract, its terms and conditions and a substantial and meritorious compliance therewith, with such certainty and definiteness as to leave no room for reasonable doubt, can ever justify the exercise of such an extraordinary prerogative.'' In the same case it was elsewhere stated: ''A court of equity in this State will specifically enforce an oral contract to make a will in a particular manner, where a valuable consideration has been received for the promise and a fraud would be perpetrated upon the promisee or beneficiary unless the contract be performed. But, the proof of such a contract must be so cogent, clear and forcible as to leave no reasonable doubt in the mind of the chancellor as to its terms and character; and where the consideration consists of acts to be performed, there must be like proof that the acts performed *refer to* and result from from that contract, and are such as would not have been done unless on account of that very agreement and with a direct view to its performance. 'There must be no equivocation or uncertainty in the case.' This doctrine is established, and its application illustrated, in a long line of cases.''

That case has since been followed and approved in Rosenwald v. Middlebrook, 188 Mo. 58, and Kirk v. Middlebrook, 201 Mo. l. c. 289, 290.

In Phillips v. Thompson, 1 Johns. Ch. 1. c. 149, Chancellor KENT observes: "It is well settled that if a party pleads part performance to take a parol agreement out of the statute, he must show acts unequivocally referring to and resulting from that agreement, such as the party would not have done unless on account of that very agreement, and with a direct view to its performance; and the agreement set up must appear to be the same with the one partly performed. There must be no equivocation or uncertainty in the case. The ground of the interference of the court is not simply that there is proof of the existence of a parol agreement, but that there is fraud in resisting the completion of an agreement partly performed." And the chancellor concludes by observing: "This case, like many others, shows the utility of the Statute of Frauds, and the danger of relaxing the sanction of its provisions. I agree with those wise and learned judges who have declared that the courts ought to make a stand against any further encroachment upon the statute, and not to go one step beyond the rules and precedents already established."

Turning now to the first essential exacted by all the authorities in this class of cases, to-wit, that the contract itself must be definite and specific for the conveyance or devising of the specific land in suit and that the proof of the contract must be cogent, clear and convincing, it must be evident that the statement of Caleb Collins that if the defendant Iowa would stay with him he would school her and educate her and give her clothing and see that she had plenty, and her assent to that proposition, fell far short of the alleged agreement to convey her the Queen City farm. As already remarked, in the testimony of those who heard these statements by Caleb Collins no mention whatever is made of any statement by him that if she would remain with him as long as he lived he would convey to her or give to her the said farm. As to the unsupported

evidence of Mrs. Harrell that after this conversation and after her assent to the arrangements made in the yard, they then went into the house and during the afternoon while they were talking in the south room Caleb Collins said he had made up his mind to give Iowa the Queen City farm if she stayed with him until he died, it must be borne in mind that this was the testimony of the mother who had been examined, cross-examined and re-examined until her evidence in the record covered over forty-five printed pages, and never until after all this long and searching examination and re-examination did she testify to any such a contract or statement. She had repeatedly said that she had detailed everything that had been stated by Mr. Collins in regard to providing for her daughter. Now the evidence tends to show that Mrs. Harrell was an intelligent witness and certainly a deeply interested one, one who was fully alive to the importance of testifying to facts which tended to establish the alleged contract for the conveyance of this piece of land. It must have impressed the trial judge as being, at least, remarkable that she had forgotten to mention this highly important statement during all of her long and tedious examination. While this court has often said that in an appeal in an equity case it would not abdicate its right to examine and weigh the testimony, yet it will defer to a large extent to the judgment of the chancellor who hears and tries the cause on the circuit, and who has an exceptional advantage in weighing the testimony of witnesses, which this court cannot in the nature of things have. So in this case, the circuit court was present and it must have appeared significant to it that this statement alleged to have been made in the house on the day of the funeral of Mrs. Collins had not been testified to by Mrs. Harrell during all of her previous examinations, when the great purpose of her testimony was to establish the existence or non-existence of this particular contract. But when the testimony itself is

closely scanned it will be noted that when left to herself without suggestion of counsel, her statement was that Mr. Collins simply said in a general conversation that he had made up his mind to give Iowa the Queen City farm. Certainly this was not the language of an irrevocable contract to specifically convey or will to this young girl that particular tract of land. In the language of the courts, it was no more than a declaration of an intention which he might abandon, or change altogether, or substitute another piece of land in lieu of that tract, but taking altogether the interest of the witness, the circumstances under which this testimony was elicited, the fact that the witness was before the court and he had an opportunity to observe her manner and her interest in the case, this court should hesitate a long time in reaching a different conclusion from that reached by the circuit court in finding that the alleged contract was not made and that the evidence fell far short of that clear and satisfying testimony which courts of equity uniformly require in cases of this character. Mrs. Stella Dooley in her evidence as to what occurred on the day of Mrs. Collins's funeral did not corroborate Mrs. Harrell as to the statement of Caleb Collins that he had made up his mind to give Iowa the Queen City farm. All that she heard him say on that day was that if she would stay with him he would always see that she had a home and he would school her and clothe her, and all the testimony shows that he fully complied with his agreement in that respect.

Ezekiel Dooley who was there that day did not hear either of the statements attributed by Mrs. Harrell to Caleb Collins in regard to this farm. Now Mrs. Harrell states in her testimony that the only persons present at the conversation in the yard with her were her brother, Mr. Dooley, and his wife, Stella Dooley, and Mr. Collins, the witness, and her little girl. As already said, Ezekiel Collins heard neither of the statements which Mrs. Harrell says Caleb Collins made on

that day. So that as far as the alleged contract made on the day of the funeral of Mrs. Collins in regard to the land in suit is concerned, the cause stands upon the uncorroborated evidence of Mrs. Harrell, unless the subsequent declarations of Caleb Collins can be said to have sustained her evidence as to the contract. Now as to these, many of them are of the most unsatisfactory character, declarations made in the most casual conversations. Thus Masterson testified that on one occasion, perhaps in 1903, Caleb Collins stayed all night with him and in talking to his wife Caleb said that he had a girl living with him and he had given her a calf and she had made a cow, etc., but that was not all he was going to do for her; that he was either going to deed her the farm or give her a farm, he would not say which. But in the same conversation witness asked why he did not sell the Queen City farm and Mr. Collins said land was rising in price and if he sold it he would have to purchase other land. When he said he thought of deeding the farm he did not say what farm nor when he intended to deed it. Rinehart's testimony was to the effect that when he offered to purchase this farm Mr. Collins said that he had thought of deeding it to the girl. Ezekiel Dooley testified that he was at Caleb Collins's in 1904 with his daughter. Iowa, the defendant, wanted to go home with him to go to school in St. Louis. The old gentleman objected and said that she ought to go to Stiles that winter, and said, "You know, Iowa, I told you I would give you the Queen City farm if you would stay with me until the last." Mrs. Harrell testified that she heard this statement. James Collins also testified that Collins told him that he had promised Iowa the Queen City farm and wanted to make a deed to it. Cooksey testified that Mr. Collins said to him in 1904, when Iowa was absent in St. Louis, that he was going to deed her the Queen City farm, that that was about all he ever said to him about it. And Mrs.

219 Sup.—20

Stella Dooley also stated that he said he was going to give her the Queen City farm, and was going to fix it up. Burchett simply testified that when some parties wanted to buy this farm Mr. Collins said he thought it would make Iowa more money for him to sell the farm and invest it in Iowa land and on another occasion he said he wanted to make a deed to Iowa to a piece of land. But defendant also introduced another witness, Mr. Melvin, who testified that he was the justice of the peace in Lancaster, Missouri, and that Mr. Caleb Collins came into his office and desired to make a deed to a piece of land in Iowa, and the justice told him that he was not the proper officer to take the acknowledgment and he left. Mr. Collins did not call the grantee's name, but said it was a girl that he had raised.

Now, of this character of testimony this court has often spoken. In Kinney v. Murray, 170 Mo. l. c. 706, this court said: " 'Evidence of such declarations, it is true, is admissible, but it never amounts to direct proof of the facts claimed to have been admitted by those declarations; and it is sometimes doubted whether it ought to be received at all when introduced for the purpose of divesting a title created by deed.' [Johnson v. Quarles, 46 Mo. l. c. 427.] 'This kind of evidence has always been received with great care, and when not supported by other evidence is generally entitled to but little weight.' [Cornet v. Bertelsmann, 61 Mo. l. c. 127.] 'The evidence consisting, as it does. in the mere repetition of oral statements, is subject to much imperfection and mistakes, the party himself either being misinformed or not having clearly expressed his own meaning, or the witness having misunderstood him. It frequently happens also that the witness, by unintentionally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the party actually did say. . . . When we reflect upon the inaccuracy of many witnesses in

their original comprehension of a conversation; their extreme liability to mingle subsequent facts and occurrences with the original transaction, and the impossibility of recollecting the precise terms used by the party, or of translating them by exact equivalents, we must conclude there is no substantial reliance upon this class of testimony.' [1 Greenleaf, sec. 200; Johnson v. Quarles, supra; Ringo v. Richardson, 53 Mo. 385; Cornet v. Bertelsmann, supra; Berry v. Hartzell, 91 Mo. l. c. 137; Fanning v. Doan, 139 Mo. 392.] 'The intrinsic weakness of this class of evidence is further enhanced in any given case by the length of time that has intervened since the declarations were made, and the ease with which it can be manufactured, and the temptation to do so, when all those by whom it could be contradicted are in their graves.' [Fanning v. Doan, 139 Mo. l. c. 412.] Such evidence can and ought to have very little weight, when it is sought by it to asperse the memory, and set aside the last will and testaments of worthy and just persons, executed in contemplation of death, and in the manner required by law, disposing of their own property according to the dictates of their own conscience.''

When given full consideration it will be seen they were at the most but the expressions of affection by Mr. Collins for the defendant Iowa and of an intention on his part to make provision for her, but it will be observed that to one witness he stated that he was going to deed her a piece of land in Iowa; to another witness, he said he had thought of giving her this Queen City farm, but he did not know but what it would be better to sell it and invest the money for her in other property. But as already said of the conversation in the house, on the day of the funeral, none of these expressions measure up to the statement that he had made an irrevocable contract with the defendant Iowa to convey her this specific land. We can add nothing to what was said by this court in Kinney v. Murray, supra, as to the unsat-

isfactory character of such evidence to make out a case of specific performance. But more than that, the chancellor had all these witnesses before him, and he heard the evidence, showing the motives which prompted James Collins, who was at that time prosecuting a similar action for one hundred and seventy-two acres of the land left by his uncle Caleb Collins, and his admission that he expected to rely upon Mrs. Harrell and the defendant Iowa to establish his right to the specific performance of a contract by Caleb Collins to convey him that land. Cooksey also was shown to have an action at that time pending against the estate of Caleb Collins for twelve hundred dollars for work and labor done. And the court must have been strongly impressed with the interest which these parties had in testifying against the heirs of this estate. The evidence consisting, as it did, of the testimony of the mother and uncle and aunt of the defendant Iowa, on the one hand, and the testimony of parties who were seeking to prove up like verbal claims to the estate of this old gentleman against whom no such claims had been preferred in his lifetime when he could defend against them. In our opinion this testimony was peculiarly a matter for the consideration of the court who saw these witnesses and heard them testify and who could weigh that testimony much better than we can. Scanning this evidence as closely as we can, we have been forced even at this distance to reach the same conclusion as he did, that it failed of that satisfactory character which a court of equity requires.

But there is still a further consideration, and that is this: in many of the adjudicated cases stress has been laid upon the fact that the party who was seeking this specific performance had severed the natural ties of affection and left his or her home and gone to the family of the decedent, and had fully performed the contract of service for which the deed or will was to be made, but no such state of facts appears in this case.

The defendant Iowa and her mother had long been inmates of the home of Caleb Collins, and had received support and maintenance at his hands, without any demand for service and without any pretence of any contract. The defendant Iowa had not been called upon to sever her relations with her mother in any degree. She remained in the same home of this kind old gentleman and benefactor just as she had been for the most of her life and she had her mother's care and protection and affection, and the same benefaction had been extended to the mother as to the daughter. According to the alleged contract she was simply to *stay in* and not to *go to* the home of Caleb Collins, and was not called upon to make any sacrifice whatever, but simply to continue to receive the same protection and support and care that he had already generously given to her, and in this respect the facts of this case differentiate it from that character of cases which appear in our reports.

When we consider the further essential that the performance must be unequivocal and must in its own nature be referable alone to the very contract sought to be performed, because it is only by performance (whereby the party to be charged is benefited) that the conscience of the promisor and those claiming under him, is bound, it is hard to conceive that Mrs. Harrell and her daughter, considering their financial condition, would have refused to continue making their home with Mr. Collins unless he had stipulated to convey them a farm, in addition to giving them a home which he had for years furnished them from the motives of kindness, generosity and relationship. On his part, left alone, without wife or children, naturally he desired their society and was willing to continue to give them a home and protection and act the part of a father to Iowa without the thought that he could only procure their assent to his bounty by making an irrevocable contract to convey them a large portion of his estate. Surely if their pres-

ence and society would sweeten his declining years, a like feeling of gratitude on their part after all his bene-factions to them would lead them, not without some 'urgent reason, to abandon him and that home, when the invitation to remain was extended to them.  Indeed it would seem that such a step had never occurred to him, and when the announcement came to him in the hour of his distress, he naturally urged them to remain, and all that occurred in the yard was entirely consist-ent with human experience and was in itself, under the circumstances, all that could have been expected.

Why Mrs. Harrell should have announced her in-tention of leaving him on that day of all others, without having consulted him about it, is inexplicable.  Surely it was not because of any thought of impropriety on her part in living there, when his age and the relationship that had existed so long, are considered, for if it was improper to remain without the contract, it was equal-ly immodest and improper to remain with it.  We think the circuit court might well have refused to believe, as it did, that Iowa Harrell and her mother continued in the home of Caleb Collins for the sole reason that he had agreed to convey Iowa this farm and that their acceptance of Mr. Collins's bounty was referable alone to such a contract.  We prefer to believe that they felt that they owed him a debt of gratitude to render him some return for all his unselfish kindness to them by re-maining with him in his loneliness and at the same time securing to themselves a home, which they so much needed. That Caleb Collins was very fond of Iowa Har-rell we have no doubt whatever.  She had lived in his home from the time she was a babe.  He had no chil-dren of his own.  He had been generous to her and her mother all her life. Neither do we question that he pur-posed to make some provision for her out of his proper-ty, but we think the whole evidence indicates that he had not fully determined what that provision should be.  At times he thought of giving her this farm and

then he thought of giving her some of his Iowa land, but that he ever made such a contract to give her this specified farm, we think the evidence fails to establish. We think that whatever he thought of doing for her, he considered it would be a voluntary gift, and not because he was bound by an irrevocable contract to give her this specific property.

In our opinion the circuit court correctly held that the defendant, Iowa Harrell, had not established her right to a decree of specific performance of a contract to convey or devise her the Queen City farm, and its judgment is therefore affirmed.

*Valliant, C. J., Burgess, Fox, Lamm* and *Graves, JJ., concur; Woodson, J.,* dissents and files dissenting opinion.

## DISSENTING OPINION.

WOODSON, J.—This suit was instituted in the circuit court of Schuyler county, and had for its object the partition of certain real estate, described in the petition, situate in Schuyler and Macon counties, among the plaintiffs and defendants, collateral heirs of Caleb Collins, deceased. Iowa Harrell filed an intervening petition, claiming the Schuyler county land, which is set out later. The petition was in the usual and proper form.

On the application of John H. Jeffries, guardian and curator of Iowa Harrell, she was made a party defendant to the suit, and she filed the following intervening petition, the formal parts omitted:

"Now comes Iowa Harrell, one of the defendants by leave of court, by her guardian and curator, John H. Jeffries, and for her answer to plaintiffs' petition, denies each and every allegation therein contained and set forth.

"Defendant further answering admits that Caleb Collins, late of the County of Davis, and State of Iowa,

died intestate and without issue or widow, on the 11th day of August, 1905; that the title to the following described tracts of land situated in Schuyler county, Missouri, appears of record to be owned by the said deceased, Caleb Collins, at his death, to-wit: The northeast one-fourth of the southeast quarter of section thirty-one and the north half of the southwest quarter, and the southwest quarter of the northwest quarter of section thirty-two except eight acres, described as follows, to-wit: Commencing at the northeast corner of said southwest quarter of the northwest quarter, thence running west about thirty-two rods on the north line of said tract to a stake ten feet from a double white oak tree, the smallest one being about six inches in diameter in the year 1870 and marked with two blazes, thence on a straight line to the southeast corner of said tract, thence north to the place of beginning, and all in township sixty-five, range fifteen, Schuyler county, Missouri.

"Defendant admits that the deceased, Caleb Collins, owned the south half of the southeast quarter of section eight in township fifty-seven in range fourteen in Macon county, Missouri, at the time of his death.

"Defendant admits that the heirs of the said deceased Collins are properly set forth in plaintiffs' petition.

"Defendant further answering says that her father died and left her when she was a small child, as his only child; that about six years ago the said Caleb Collins' wife died, and left him alone without issue; that he was a man of considerable real and personal property both; that his father and mother were dead; that his wife was a sister to the mother of this defendant; that shortly after the death of the said Caleb Collins' wife the said Caleb Collins contracted orally and agreed with this defendant that if this defendant would live with him, stay with him and comfort him until his death that he would give, transfer and convey to her

all of the Schuyler county land above described in consideration therefor. This defendant answering accepted said proposition on the part of said Caleb Collins and contracted and agreed with said Caleb Collins to live with him, stay with him and comfort him until his death; and in pursuance of said agreement, this defendant lived with, stayed with and conforted the said Caleb Collins from the time said agreement was entered into until his death, and performed the said agreement on her part fully. The death of said Caleb Collins occurred on the 11th day of August, 1905. By reason of which contract and the performance thereof, by defendant, the said described real estate situated in Schuyler county, Missouri, is owned absolutely by this defendant; that the said Caleb Collins failed and neglected to keep his part of said contract prior to his death and failed to convey, transfer or deed said land to this defendant; that the plaintiffs herein and the other defendants have no interest in said land.

"Wherefore this defendant prays the court that a decree be entered in this cause declaring this defendant to be the absolute owner of said real estate and that the other plaintiffs and defendants in this cause be decreed to have no interest whatever in said real estate; and that the title to said land be vested in this defendant, and the plaintiffs and the other defendants be divested of all right, title and interest in and to said tracts of land, situate in Schuyler county, Missouri, aforesaid, and for all proper and general relief."

Defendants Albert H., Ira W., Ed. R., James and Lina D. Collins, and Sallie Gibson, filed the following answer:

"That it is their distinct understanding that said land in Schuyler county set out in the petition belongs to Iowa Harrell of Stiles, Iowa, and that she obtained same from her uncle, Caleb Collins, during his life. We further state that it was distinctly understood shortly before the death of said Caleb Collins that said

land should be and was the property of said Iowa Harrell and this understanding came from a statement made by said Caleb Collins to certain of the parties hereto. We therefore disclaim any interest in said land and ask the cause to be dismissed as to us and that there be no costs taxed to us in the final judgment in said cause but that the costs, if any, be taxed against those only who make the claim to the land.''

The answer of Thomas R. Hollingsworth was as follows:

''Now comes Thos. R. Hollingsworth by his guardian *ad litem,* P. O. Sansberry, for answer to plaintiffs' petition, and asks the court to strictly protect his interest.''

Plaintiffs' reply to the answer of Iowa Harrell was a general denial and a plea of the Statute of Frauds.

When the cause was called for trial Iowa Harrell, the intervener, demanded a trial by a jury, which the court denied, and proceeded to try the cause as a chancellor, to which ruling and action of the court she duly excepted. The court found the issues for plaintiffs, and entered a decree partitioning the land as prayed for in the petition. In due time Iowa Harrell filed her motions for a new trial and in arrest of judgment, which were, by the court, overruled, to which action of the court in so overruling her said motions she duly excepted, and timely appealed the cause to this court.

I. Counsel for intervener, Iowa Harrell, insists that the findings and decree of the circuit court denying specific performance of the contract set out in her intervening petition are not supported by and are against the great weight of the evidence; and that this being a case in chancery, it is our duty to review the evidence and pass upon the weight thereof; and if found to preponderate in her favor, to reverse the de-

cree and enter one in this court in her favor specifically enforcing the contract.

This court has uniformly held that in equity cases it would on appeal proceed *de novo* to hear and determine the cause, deferring somewhat to the findings of the trial court; but if its findings and decree were not sustained by the evidence and the law, then this court would proceed to make its own findings and enter such a judgment as equity and justice might require. [Gibbs v. Haughowout, 207 Mo. l. c. 391.]

Under the rule above announced we have reviewed the entire evidence, as presented by the abstract of record, which is very voluminous, and have carefully considered and weighed the same.

According to the record disclosures, the following facts stand undisputed, viz: Plaintiffs and defendants are collateral kindred of the deceased, Caleb Collins, who died intestate, without a widow or legal descendants, in Davis county, Iowa, on August 11, 1905. At the time of his death he owned about five hundred acres of land, situate in that county, besides what he owned in this State. The land involved in this case is 152 acres and is located near Queen City, Schuyler county, and is known and referred to in the record as the "Queen City farm."

Caleb Collins was an elderly gentleman at the time of his death; and was a man of more than ordinary intelligence; he was secretary of the school board, counselor for many of his neighbors, kept the Iowa statutes, regarded as a safe legal adviser, a successful business man, and commanded the respect of his neighbors. He was kind, sympathetic and charitable. For a number of years prior to his death Maggie Harrell, his wife's sister, her daughter, Iowa Harrell, and her aged and afflicted father had made their home with him.

Intervener's father, Dr. Harrell, died in 1890, when she was only eleven months old, and upon his death her mother, Maggie Harrell, took her to the home

of Caleb Collins, where they resided as members of his family practically all the time until the death of his wife, who was the sister of Mrs. Harrell, which occurred in 1898. During a short period of that time she was absent attending to her deceased husband's business; and for a few months in the year 1902 she conducted a hotel at Leroy, Kansas. The intervener was in Kansas with her mother during those few months. Mrs. Harrell went to Kansas for the purpose of giving her daughter, Iowa, a better education and placing her in better society.

The mother was a stenographer and she served as such for a short time in a lawyer's office in Leroy. While in the hotel business her health failed and she and Iowa returned to the home of Mr. Collins, where they resided until his death, which occurred, as before stated, in 1905.

From 1890 to 1905 Collins gave the mother and daughter a home, clothed and fed them, and sent Iowa to school, and paid their medical bills. During the time they resided with him he became very much attached to Iowa and spoke to and of her in very affectionate and endearing terms, and frequently said he intended to do something for her, and on several occasions stated that he intended to give her the Queen City farm.

Intervener claims the contract set up in her intervening petition was entered into on August 24, 1898, the day of Mrs. Collins' funeral. At that time she was about nine years old.

Mr. Collins grieved greatly over the death of his wife, and on the day of her death Mrs. Harrell concluded to change her and her daughter's place of abode, and discussed the matter with her brother, Ezekiel Dooley.

She testified that when Collins heard them discussing the matter he pleaded for them to remain with him, and then and there made and entered into the contract in question with Iowa, to the effect that, if she would

stay with and take care of him until his death, he would deed to her the Queen City farm. She also testified that Iowa accepted his proposition and agreed to live with him and care for him until his death, and that she fully performed her part of the contract.

The contention of the respondents is that the evidence fails to establish the contract stated in the petition, or its performance by Iowa Harrell; while, upon the other hand, her counsel insist that the evidence shows beyond a reasonable doubt that the contract was entered into by Caleb Collins and Iowa Harrell, and that she fully performed and executed her part of it, and that a denial of specific performance thereof would be unjust, inequitable, shocking to the conscience of the chancellor, and would work a fraud and irreparable injury upon her.

These contentions of the respective parties present the vital question involved in this case for determination.

Intervener starts out in the contract with the laboring oar and undertakes the burden of overcoming the Statute of Frauds which requires such a contract to be in writing by showing beyond peradventure that the contract was actually made, and that it was fully executed on her part.

Learned counsel for respondent assails the sufficiency of the evidence to make out a case for appellant for two reasons, first, because the probative force of the evidence shows that Mr. Collins only contemplated giving the land in question to her as a voluntary donation, prompted by love and affection entertained by him for her, and not based upon a contract obligating him to do so; and, second, for the reason that the record discloses the fact that all of the evidence tending to prove the alleged contract comes from interested parties, some of whom have claims pending against the estate, and so marked with fraud and collusion between them that it is unworthy of belief, and that the chan-

cellor was wholly justified in refusing to give it credence.

We will discuss those two propositions in the inverse order in which they are stated.

Before we proceed to the consideration of the evidence of the case, it might be well to state that the principles of law governing this case are so well and firmly settled in this State that it would be a supererogation of labor to rediscuss them in this opinion. We will content ourselves by simply stating the rule which has been so often stated by this court in similar cases.

The clearest and strongest statement of the rule to which my attention has been called is by LAMM, J., and is found in the case of Kirk v. Middlebrook, 201 Mo. l. c. 289, which is in the following language:

"As equity follows the law, it [the contract in such case] is non-enforceable in equity, except on one high condition; and such condition arises when the non-enforcement of the contract would work an equitable fraud upon the promisee; that is, the conscience of the chancellor is stirred and relief is extended in his open palm when, and only when, it is certain beyond the peradventure of a doubt that to deny the relief would be to strike down the underlying purpose of the Statute of Frauds, to-wit, the prevention of frauds and perjuries. . . . When a court of equity is called upon to exercise this high and delicate function, it asks, as an irreducible minimum of those who seek relief, proof showing beyond a reasonable doubt: first, not only that some contract existed, but that the precise contract in suit existed; second, the terms of the contract should be so clear and definite as to leave no doubt in intendment and certainty; third, performance on the part of the promisee should be shown, and that performance must be unequivocal, and must in its own nature be referable alone to the very contract sought to be performed, because it is only by performance. . . that the conscience of the promisor and those claiming

under him is bound; fourth, and the acts relied on to show performance must point to the contract in suit and none other.''

The last utterance of this court upon the subject is found in the case of Wales v. Holden, 209 Mo. 552.

We will now consider and weigh the evidence of this case, and apply to it the rule above stated.

In the first place, Mr. Collins was an elderly gentleman (his exact age not appearing from the record, for the reason he was averse to telling his age), with more than ordinary intelligence; kind and affectionate in his nature, charitable in disposition, and possessed of seven or eight hundred acres of land and eight or ten thousand dollars worth of personal property.

He was married, but of that union there were no children born. He and his wife lived together for many years upon a farm in Davis county, in the State of Iowa. She was a sister of Mrs. Maggie Harrell, the mother of Iowa Harrell, the appellant in this case. Dr. Harrell, the father of Iowa, died in the year 1890, and from that time until the death of Mr. Collins, which occurred in August, 1905, Iowa and her mother lived with him practically all the time, and after the death of his wife, which occurred in the year 1898, they kept house and cared for him until his death. At the time Iowa and her mother first went to reside with Mr. Collins and his wife the former was only nine months old, and from that time up to the time of the death of Mrs. Collins, Mr. Collins had become greatly attached to Iowa, and loved her as affectionately as a father would love one of his own children.

The following facts were shown to exist by the great preponderance of the evidence, to-wit: That after the death of Mrs. Collins, and on the day of her funeral, Maggie Harrell, Ezekiel Dooley and his wife, Stella Dooley, were standing in the yard at the home of Mr. Collins, and in his presence and hearing, and in that of Iowa Harrell, Mrs. Harrell, while discussing

the death of her sister and the further plans of herself and her daughter, said to her brother, Ezekiel Dooley, that she and Iowa were going to gather up their belongings, load them in the wagon and go home and live with him; that when Mr. Collins heard that remark he said, "No", and came up to where Iowa was standing and said to her. "You are not going to leave me now" . . . "You are not going to leave me now in my bereavement and leave me here all alone," and that he then began to cry, and Iowa ran to him and placed her hands in his and sympathized with him, when he again said to her, "No, Iowa, stay with me and I will school you and educate you and give you all your clothes. You live with me and I will see that you have plenty." Iowa then put her hand in his and said, "I am going to stay with Uncle," and they then started off and went into the house together. Shortly after that occurrence they were talking about the home place and the other farms he owned, and he said to her in their presence that he had concluded to give to her the Queen City farm because he thought it would be better for her than the one on which they were living on account of the wood being there. He also said to her that the conditions upon which he gave her the farm were that she would have to stay with him as long as he lived—to the last—and care for and comfort him in his old age. In reply to that she said she would do it. He then said, if you will I will give you the Queen City farm.

A portion of Maggie Harrell's testimony regarding the terms of the contract was in the following language:

"Well the day after my sister's funeral—we had the wagon, my brother and I; my brother Zeke and his wife, Mr. Collins and several of them, I don't recall who all they were now, there were several standing in the yard talking, I don't remember who all were there. I don't just now, I could recall there were several out there though I don't know who they were now. I don't

Collins v. Harrell.

remember talking to them about that. It impresses me Mr. Caleb Collins was out there. My daughter was there; she was playing there with her cousins.

"Q. What conversation, if any, took place there by Mr. Collins with reference to Iowa?

"*Mr. Fogle*: Q. Now you confine yourself to the conversation that took place between Mr. Collins and your daughter, Iowa.

"A. I said to the little girl, 'We will get our things and go home with brother Zeke and make our home,' and Mr Collins said, 'No', Iowa was in the yard. He came to where the little girl was and he said, 'You are not going to leave me now.'

"Q. To whom was he directing his talk? A. To the group. He said Iowa was my babe and he turned to the little girl, and she looked up at us and he said, 'You are not going to leave me now.'

"*Mr. Fogle*: Q. What did he say? A. He said, 'You are not going to leave me now in my bereavement and leave me here alone,' and he began to cry and the little girl sympathized with him. She ran to him and put her hands in his hands, and he said, 'No, Iowa, stay with me and I will school you and educate you and give you all your clothes. You live with me and I will see that you have plenty.'

"Q. Go ahead and state what occurred? A. Iowa put her hand in his and said, 'I am going to stay with Uncle.' They started off and went into the house together. She said she was going to stay with her uncle.

"Q. What was the next conversation you heard between Mr. Caleb Collins and Iowa? A. Well, I don't know as I understand the question.

"*The Court*: Relative to her staying there?

"A. They went in for a little while after that, and he went on doing for her. We stayed there with him and afterwards he said that he made up his mind to give her the Queen City farm.

219 Sup.—21

"Q. Talked to her? A. Yes, sir.

"Q. What did he say to her? A. In the talk that came up afterwards we were talking about the home place that we lived on and the two farms that he owned and he said that he had concluded to give her the Queen City farm—he thought it would be better on account of the wood being there than the one we lived on.

"Q. How soon after the other conversation in the yard? A. Well it was may be some little time after that before this other came up.

"Q. Did Iowa then continue to stay with him? A. Stayed with him, yes, sir.

"Q. Now, what, if any, conditions did he couple with giving her the Queen City farm, what did he say she would have to do after that? A. She would have to stay with him as long as he lived—to the last.

"Q. And what, if anything, would Iowa say to him when he said she would have to stay with him as long as he lived, or until the last? A. She said she would do it; she never gave a word of inclination that she wanted to leave him.

"Q. Then on his statement that if she would stay with him as long as he lived, or until the last, what did he say he would do for her, if anything? A. He said he would give her this farm, the Queen City farm.

"Q. Now, I want you to commence and detail that conversation that occurred between Mr. Collins and your daughter, just state exactly what happened, give it all, give the statement, how it came up and everything. A. Well, we were at home and we were talking about different farms that he had, and the suitableness of them—he lived on that farm and he said that he had made up his mind to give Iowa the Queen City farm, if it would suit her, and she said she accepted that, if I understood you. He said he had made up his mind to give her the Queen City farm; that she was to stay with him, take care of him until the last, as long as he lived."

As contended, if the foregoing testimony is read alone, then there is some confusion about the date the contract was actually entered into; but when the entire evidence is read together and the interruptions of counsel for respondents are considered, it is perfectly clear that the contract was entered into the day after the death of Mrs Collins.

Mrs. Harrell and her brother, Mr. Dooley, also testified that in 1904 the latter was living in St. Louis and that he and his daughter were visiting her and Iowa at the home of Mr. Collins, when the daughter of Mr. Dooley expressed a wish that Iowa would return to St. Louis with her in order to attend school down there. That sometime later in discussing that question with Iowa, Mr. Collins said to her, "No, Iowa, I cannot get along without you. It is so lonesome without you. I want you and your mamma to stay with me. You can go to school a winter longer here at Stiles. You know you agreed to stay with me if I would give you the Queen City farm." She said in reply, "Yes", and told him that she still wanted to go to St. Louis but she would stay with him.

These same witnesses stated that they heard Mr. Collins say many times that he was going to give the Queen City farm to Iowa, and that he was going to fix up the house on it for her so she could live in it and make it her home.

Mrs. Harrell also testified that Mr. Collins told her that he wished to make a deed to Iowa, conveying to her the Queen City farm, and that he went to Bloomfield, Iowa, to have Mr. S. S. Caruthers draw the deed for him, but that he forgot to take with him the description of the land, which prevented him from having the deed drawn; and that subsequent thereto he wrote the letter to Mr. Caruthers read in evidence, dated July 29th, 1905, asking advice as to how to draw the deed, which, however, was never mailed, for the reason that

he was taken sick and died before he had an opportunity of doing so.

James Collins testified that he was a nephew of Caleb Collins; that he was at the latter's home frequently during the last five years of his life, and was there nearly all of the last two years thereof; that he knew Iowa Harrell; that she lived with Mr. Caleb Collins, and that he treated her like one of his own children—kindly and affectionately. In 1905, the day when Hiram McLaughlin was buried, while he and Mr. Collins were standing at the gate leading into the farm he said to me that he had promised the Queen City farm to Iowa Harrell, and that he wanted to see Sam Caruthers and have him make a deed for him conveying the farm to her so they could not beat her out of it. At different times he discussed the matter with me and also the condition the farm was in. In 1903 he spoke to me about making out a bill and a statement of the dimensions of the lumber and the amount it would take to build her a house on the farm. I made out the list and what it would cost. He talked of having the lumber sawed on the place, that was in July, 1903. He said he wanted to fix the place up for her and build a square house of four rooms. I figured on the job, but someone else built it. A man lived there then and he built the house. I saw Mr. Caruthers and told him what Mr. Collins said regarding the deed. On cross-examination, he said he had a similar suit pending in the district court of Davis county, Iowa, in which he was claiming that Mr. Collins made an oral gift to him in April, 1905, of the Savannah farm of one hundred and seventy-two acres.

John W. Cooksey testified that Mr. Collins spoke to him about deeding the Queen City farm to Iowa Harrell. He was on his way to Kansas City at the time and he said to me that "Babe," as he called her "had gone to the St. Louis fair." . . . "I am going to fix her so she won't have to work out when I am gone."

And I said, "Uncle, what are you going to do?" and he said, "Deed her the Queen City farm." I heard him say she was good to him and he never asked her to do anything for him but what she did it.

George W. Melvin testified: That he was a justice of the peace at Lancaster, Schuyler county, Missouri; that he knew Caleb Collins; that Mr. Collins called him into his office one day and told him that he wanted to make out and take his acknowledgment to a deed conveying a certain piece of land in Davis county, Iowa, to Iowa Harrell; that he told Mr. Collins that he had no authority to take the acknowledgment to a deed conveying land located in the State of Iowa, and that he had better get a notary public to take the acknowledgment. He said he would do so and he thought it was a duty he owed her, and he then went away.

B. B. Burchett testified: That he had been sheriff of Davis county, Iowa, for four years; that he knew Mr. Caleb Collins; that he had a talk with him one day about conveying a piece of land to Iowa Harrell; he said "she was the sweetest child he ever knew, and that she could not be closer to him if he had been her father—he was proud of her." He said she had a lady's head on her shoulders, and that he was going to school her and make a lady of her so that anybody would be proud of her. He also said when she was in Leroy, Kan., that they had advanced schools out there and that he aimed to fix his business here as best he could and go out there and make his home with her and her mother; that he took a great interest in her and her advancement. Some two or three years before his death I was at his home and spoke of some land-buyers from Missouri who wished to purchase the Queen City farm, and he said that he thought it would make Iowa more money for him to sell it and invest the proceeds in Iowa land, but he also said that "recently Missouri land is advancing in value, and I am not right sure but that it will come up to ours up here."

I was at his house twice during his last sickness. The first time I just dropped in to see him, but the last time was at the suggestion of the Collinses, which I regretted to do, but did so at their earnest request. I asked him if his business was in the condition in which he wished it to be. He said, "No, it was not." He said, "I want to make a deed to Iowa to a piece of land," and also said he wanted to "make a will." He said that the last time he had seen Sam Caruthers he told him what he wanted to have him make. He said he had written Caruthers, or had spoken to him about what he wanted, and I am not sure which he said. I told him that if he wanted me to, I was going to Bloomfield and would send Caruthers right down there if he said so, and he said, "I am too weak, sick and nervous today; if he was here I don't know as I could sign my own name; I am feeling awful weak," but he said "hold yourself in readiness so if I don't get any better." He said, "Ira told me the symptoms were better, that you (I) will be much better tomorrow." He said, "If I do not, I will 'phone you to have Caruthers come down," and I said, "I will be in town to-morrow, and, of course, will do that much for you." The next time I heard from him he was dead.

W. A. Rhinehart testified: That in the fall of 1902 he had a talk with Mr. Collins about buying the Queen City farm, and he said he did not care to sell it; that he had talked of giving that particular piece of land to a young lady living at his house—he called her "Babe" and "Iowa." He called her by both names. I never saw her before or since.

William Masterson testified: That he knew Mr. Collins, and that when he visited the Queen City farm he would frequently stay with him; that Mr. Collins had a girl living with him but he never knew her name until he heard it here in the court room; that one time when Mr. Collins was at my house he told me that he had given the girl a calf, and she had made a cow,

etc., and he said, ''That is not all I am going to do for her,'' and previous to this time he told me he was either going to deed her the farm or give her the farm, and I won't say which.

All the evidence on both sides shows, and it is undisputed, that Iowa Harrell and her mother lived with and kept house for Mr. Collins from the date of his wife's death down to that of his own death—about seven years, with the exception of some three or four months spent by her and her mother in Leroy, Kansas. It is also undisputed that they cared for him and administered unto his wants and necessities during all those years, and nursed and cared for him during his last sickness, and that Iowa treated him with the greatest kindness and with love and affection, as much so as if he had been her own father.

Mr. Hybarger testified, on the part of plaintiffs, that he was at Collins's in an endeavor to buy the land in the fall of 1902. That Mrs. Harrell was present. That Collins was reluctant about selling the land when Mrs. Harrell spoke up and urged him to sell it. To her Collins replied that he had an idea of his own about the farm; that he did not know but that he might want to give it to her and Iowa for a home, to which Mrs. Harrell replied that she would not have it for a home if she had to live on it.

Elmore Israel testified to a talk he had with Collins while Mrs. Harrell and Iowa were running the hotel in Kansas, whither they had gone in direct violation of the terms of the purported contract upon which the intervener bases this suit, that he sometimes thought they were trying to force him to make over some property to the child. That he intended leaving the child something, but not at present.

Thomas F. Collins, one of the administrators, testified that at the time he was taking the inventory Mrs. Harrell said to him, ''Uncle Cale gave Babe these two cows and this calf and this mare.'' ''I said, 'Is that

all?'" and Mag said, "Yes, that is all.". After the sale Mrs. Harrell told him she would like to have him give Babe and her the Queen City farm.

Al Ray, who lived at the Collins home, testified that a few days after the death of Collins, Mrs. Harrell said to him: "If he [Cale] has not made a will Babe and I will get nothing." That during his last illness Mrs. Harrell said to him: "If he gets well he will do something for Babe and me. If he don't get well we will get nothing." I asked her if Cale had ever given Babe anything and Mag replied, "Nothing but a horse and a cow."

Dr. Grant Giles testified that Mrs. Harrell said to him after Collins's death: "I and Babe would like to have the Queen City farm, and if Uncle had lived he would have given it to us." That a day or two after the sale she told them, "If Uncle had lived he would have given Babe and me something." She told him that Cale had said to her while he was sick: "Don't cry; maybe I will get well and if I do I will give you and Babe something." The doctor further testified that Ezekiel came to him and asked if Collins had left a will, as he was anxious to know whether or not Babe and Mag would get anything out of the estate.

Sam LeGrand testified that in 1901 he went to Collins to see about renting the farm. While Collins was away Mrs. Harrell said to him: "You ought to buy the Queen City farm." To which he replied, "I did not know Uncle wanted to sell it." Mrs. Harrell then said to him: "Uncle cannot look after it and he is getting so old he cannot look after it and he has more land here than he can take care of; he could loan the money and get more out of it than he does out of the farm with less trouble."

James H. Collins, one of the administrators, testified that Mrs. Harrell told him that "Cale always intended doing something for us and we would like to have Iowa get the Queen City farm."

Plaintiffs also introduced evidence showing that James Collins had a similar suit to this pending in the district court of Davis county, Iowa, against the heirs of Caleb Collins, to recover 170 acres of land, based upon an oral contract of similar import to the one made with Iowa Harrell; also showing that John W. Cooksey was prosecuting a claim against the estate for the sum of $1,142.64 for work done and material furnished by him for certain buildings and other improvements made by him on one of Caleb Collins's farms, located in the State of Iowa, covering the period from 1891 to 1905.

If this evidence is to be believed, then there can be no doubt but what Caleb Collins entered into the contract with Iowa Harrell stated in the petition; and that she fully and fairly performed her part thereof. One of them testified that she was present when the contract was made, and testified positively what the terms thereof were. Two others testified that Caleb Collins told them that he had agreed to give Iowa the Queen City farm in consideration of her agreeing to stay with him and to care for him and comfort him during the remainder of his life.

Mr. Collins was old, and was left alone in the world by the death of his wife; he was greatly bereaved by her death and loss of his life-long companion, with no children or other descendants of his own to lean upon or upon whom to bestow his generosity and affections; nor had he those of his own blood to love him, care for or to administer unto him in his old and declining years.

What was more natural than for him to turn his mind and affections to the niece of that beloved and departed wife, whom he had virtually reared from infancy, and whom he had learned to love, and around whom his affections had entwined as tenderly and fondly as if she had been his own child? What noble sentiment that springs from the human heart would

have suggested his selection of some other one in pref-
erence to her to live with and care for him in his lonely,.
sad and declining days, and upon whom he might be-
stow his affections and donate a portion of his worldly
goods? Spontaneously comes back the answer—none.

That being true, then what was more natural than
for him to make provision for the dependent object of
his affections out of the amplitude of his fortune in
consideration of the care and loving services to be ad-
ministered unto him by willing and affectionate hands?
The mere asking of these questions carries with them
their own answer—nothing.

Those were the conditions surrounding him, and
the relations that existed between them at the time the
alleged contract was entered into.

The death of Mrs. Collins suggested to Mrs. Har-
rell the propriety of the departure of herself and
daughter from the home of Mr. Collins, which severed
all her claims and natural ties to that hospitable home,
and prompted her to make other arrangements for a
home for herself and Iowa.

While discussing that matter with Mr. Dooley, her
brother, Mr. Collins entered a protest against their
leaving him and taking up their abode with her brother.
He reminded them of his old age, helpless condition
and sad bereavement, and pleaded with tears in his
eyes with the young and affectionate child, who knew
no other father, not to leave him in that sad plight, and
very naturally said to her in the presence of her
mother, and afterwards repeated in the presence of
her uncle and many of his and their neighbors, that if
she would stay with and care and comfort him to the
end he would provide a home for her, clothe and edu-
cate her, and give her the Queen City farm, which at
that time was not worth more than $3,500, with the
beneficial use thereof withheld from her until death
should remove him, which, of course, largely detracted
from that value. Why should he not have made that

arrangement with her? It was the most natural thing in the world for him to do, not only from a financial point of view but also from one of care, comfort and ease in his declining days. He thereby made his home permanent, surrounded by those who were nearest and dearest on earth to him, who were ever willing to administer with a kind hand unto his wants, and contribute to his pleasures and happiness. By so doing he took nothing from anyone who had any claims upon him or his bounty. He had no children or other lineal descendants, or ascendants for that matter, who were dependent upon him; none but collateral kindred, whom the record fails to disclose had any claims whatsoever upon him, or who ever contributed in the slightest degree to his comfort or well being.

Those are the matters testified to by Mrs. Harrell, Ezekiel Dooley and Stella Dooley, his wife. But it is argued that Caleb Collins did not agree to give Iowa the farm because her mother did not testify to the terms of the agreement until after she had been asked several times about it. That is true, but upon an inspection of the record it will be seen that when interrogated regarding the contract, the shrewd objections of counsel would divert her mind from the question, and it was not answered fully until she did so upon her redirect examination. But those facts do not rest exclusively upon their testimony. There are other persons who testified in the case whose evidence is just as convincing as theirs.

James Collins testified that he was a nephew of Caleb Collins, and that he heard his uncle say upon several different occasions that he was going to convey the Queen City farm to Iowa Harrell. Also that he wanted to see Sam Caruthers about drawing the deed for him. In this he is corroborated by the testimony of Mrs. Harrell, who said Mr. Collins went to Bloomfield to see Mr. Caruthers about the same matter, but failed to have the deed executed because he forgot to take

with him the description of the land.   She also testified that upon his return home from Bloomfield he wrote the letter before mentioned to Mr. Caruthers regarding the deed.  Both James Collins and Mrs. Harrell are corroborated upon that point by the testimony of Mr. Burchett, an ex-sheriff of Davis county, Iowa, and who visited Mr. Collins twice during his last illness.   During his last visit Mr. Collins expressed a desire to deed the Queen City farm to the intervener, and stated to him that he had either written Mr. Caruthers regarding the deed or that he had consulted him orally regarding the matter, and that he was not sure which.

James Collins also testified that his uncle told him that he wished to build a house on the farm for Iowa, and had him make out a bill for the lumber required for that purpose, and to make an estimate of the probable cost of the house.  The evidence shows that he afterwards built the house, but got someone else to build it.

Mr. Cooksy testified that he heard Mr. Collins say he intended to leave Iowa in such shape that she would not have to work out; that he was going to convey the Queen City farm to her; and that he was going to have it deeded to her so they could not beat her out of it.

Mr. Rhinehart testified that he knew Mr. Collins and the land in question; that he went to Mr. Collins with a view of purchasing the land, but he refused to sell it, and assigned as his reason for such refusal that he thought he would give it to Iowa.

Mr. Masterson testified that he resided near the Queen City farm, and that. Mr. Collins frequently stayed with him while visiting the farm, and that upon one or more of those occasions he heard Mr. Collins say that he was going to give the farm to the young lady, whose name he did not know at the time, but subsequently learned that her name was Iowa.

Mr. Burchett, who seemed to be an absolutely disinterested witness and a gentleman of good sense, tes-

tified that he had known Mr. Collins about twenty years; that he knew him well, and frequently visited him; and visited him twice during his last illness. The last visit was made at the request of some one of the Collins's for the purpose of ascertaining what disposition, if any, he had made of his property. He told Mr. Burchett that he had made no disposition but that he wanted to deed to Iowa the Queen City farm, and wanted to make a will also, but did not state what property he wished to will or to whom he intended to will it. He made arrangements with Mr. Burchett to hold himself in readiness to go on a moment's notice after Mr. Caruthers, an attorney at law, at Bloomfield, Iowa, with whom he had previously consulted orally or by letter regarding the execution of said deed and will. Death, however, intervened and prevented their execution.

If this evidence is true, and if it was not the intention of Caleb Collins to make a voluntary gift of the Queen City farm to Iowa Harrell, then there can be no reasonable doubt about the fact that they entered into the contract mentioned, and that she fully and faithfully performed her part of it, and that he at all times fully intended to execute his part thereof by conveying the farm to her by proper deed of conveyance, which was prevented by his unexpected death.

Counsel for respondents insist that this evidence is not worthy of credence, and for that reason the trial court disbelieved it and found the issues against the intervener. The basis of that contention is predicated upon the facts that several of the most important witnesses for her are either blood relations, or that some of them have claims pending against the estate, and that they testified in her behalf in consideration of and in expectation that she and her relations would in turn testify for them, and thereby establish their respective claims; and by that fraudulent conspiracy to rob and loot the estate of Caleb Collins, deceased. That is a

very serious and grave charge and should be well established before concurred in by this court. After a most careful review of all the evidence preserved in the record, we find that there are but three facts appearing therefrom which are relied upon by counsel as supporting that alleged fraudulent conspiracy. One is that two of the witnesses mentioned are blood relations of appellant, namely, her mother, Mrs. Harrell, and her uncle, Ezekiel Dooley; second, that two other of her witnesses, James Collins and J. W. Cooksey, have claims pending against the estate; and, third, that the latter two expect appellant to testify in their favor when their claims are heard.

It will be noticed that the majority opinion lays great stress upon the fact that James Collins and Ezekiel Dooley, two of Iowa Harrell's witnesses, had those claims pending against the estate of Caleb Collins, and it holds that their testimony is unworthy of belief for that reason; yet there was not a word of testimony introduced tending in the remotest degree to show that either of them were not just demands, or that a fraudulent conspiracy had been entered into between them to loot and sack the estate of Caleb Collins. There was no charge of conspiracy presented by the pleadings, and she was given no opportunity to meet such an issue. Without plea or evidence it is arbitrarily held that there was a conspiracy existing between them, simply because they had claims pending against the estate, and, as before stated, without a word of testimony tending to show that they were unjust, the majority opinion virtually holds such conspiracy actually existed and that all of the claims were fraudulent and that none of her witnesses were worthy of belief.

In reply to that contention it might be suggested that those facts are more in the nature of coincidences rather than evidence of the existence of fraudulent conspiracy. The existence of those facts is not un-

usual or out of the ordinary; but, if fraudulent, that fact should have been proven.

If a child of that age had made a contract of the character mentioned, who would most likely know of it? Of course, her mother and relations.

Many estates have one or more claims presented against them, and it is not unusual for the owner of one claim to have knowledge of the existence of the other which would make him a material witness if the claimant should see proper to use him as such. Fraud is never presumed to exist, but must be established by evidence just as any other fact must be established; and in the absence of all such evidence, as in this case, the court would not be justified in drawing the conclusion from those facts alone that a conspiracy existed among the various persons mentioned to defraud the estate. While such interest should be weighed and considered along with all the other facts and circumstances in determining what weight should be given to their testimony, yet their coexistence alone should not, as a matter of law, brand all of the claims as spurious and fraudulent, as is virtually held in this case.

Besides all that there is not a breath of suspicion cast against the honesty, morality or veracity of any of the witnesses, except in one or two instances where it was attempted to show contradictory statements regarding matters which were wholly irrelevant and immaterial to the issues involved in the case.

Under our statute interest alone in the result of a suit does not disqualify a witness from testifying, but such interest may be shown to affect his credibility, but that alone, as a rule, does not destroy the total weight of such witness's testimony. If that were true, then it would be a vain and useless thing to place an interested person upon the witness stand for any purpose.

We have carefully considered the testimony of respondents' witnesses, and there is nothing therein to

contradict or militate against the conclusions before stated.

This brings us to the consideration of respondents' second contention, namely, that even though the court should believe that the testimony of intervener's witnesses is true, yet it is insisted that all the evidence shows that Mr. Collins only intended to make a voluntary gift of the farm to appellant, and not a contract by which he bound himself to convey it to her; and that being true, a court of equity will not specifically enforce such proposed gift.

If we correctly understand counsel for respondents, this is their main reliance in this case, and that they lay much more stress upon this contention than they place upon the question previously discussed regarding the credibility of the witnesses.

But preliminary to the observations I desire to make in this case, I wish to state that I am not unmindful of the importance of section 3418, Revised Statutes 1899, commonly called "The Statute of Frauds," which requires all contracts for the sale of land to be in writing, and signed by the party thereto who is sought to be charged thereby.

So impressed am I with the wisdom of that enactment, that I am thoroughly convinced in my own mind that one of the most serious errors this court has ever committed was in holding that when such a contract has been executed by one of the parties thereto, equity should relieve him from the operation of that statute. By so doing it has written into the statute an exception which the Legislature never enacted or intended to exist. That judicial interpolation owes its existence to what is known in the law as "hard cases make bad laws." That is literally true in this instance, and if the courts would only bear in mind when dealing with hard cases that bad laws produce so much more wrong and injustice than hard cases do, then I apprehend there would be less bad laws and fewer unjust decis-

ions found in our reports. And I am also so deeply impressed with the wrong and injustice which are constantly growing out of that exception that, if my voice would wipe it from our jurisprudence, I would not hesitate one moment in so expressing myself. The original object the courts wished to accomplish by writing that exception into the statute was to relieve a party from its harsh operation who had performed his part of the contract, and thereby avoid the unjust results flowing from the refusal of the other party to perform his part thereof, and at the same time retain the consideration paid to or received by him; but later, during the growth and development of that doctrine, designing persons availed themselves of that exception by bringing suit upon trumped-up contracts and relied upon perjured testimony for their specific performance. So numerous were those cases, the courts again felt called upon to improvise another rule by which to qualify the broad exception before written into the statute, and thereby circumscribe and prevent the wholesale frauds which were slipping through that exception. They adopted the rule now in force, which requires the plaintiff to plead the contract of sale with certainty in all of its details, and to prove the same by such a preponderance of the testimony as to leave no room for reasonable doubt in the mind of the chancellor as to its existence, as it is written in many of the reported cases. By reading those cases it will be seen that many a designing landowner has taken advantage of the strictness of that rule, and has under the cloak thereof approached minors, widows and orphans, also ignorant and confiding persons, who are not infrequently ignorant of the Statute of Frauds and of the law of contracts, and by means of vague and indefinite promises and innuendoes, has caused them to believe he intended to *give* them lands in consideration of services to be performed by them for him during his

219 Sup.—22

old and declining days, and by that means has secured their services for years without being required to pay one cent therefor. In my judgment, the rule, if tolerated at all, should operate alike upon both parties to the contract. If the promises and innuendoes are sufficiently specific and definite as to cause the minor to believe, and the members of her family and friends to believe, as in the case at bar, she was working for and in consideration of his promise to give her the farm, then when he received her services under that promise the courts should not hesitate in holding that it was sufficiently definite and certain to bind the landowner also, otherwise he would receive the benefit of her services without paying one cent therefor.

Before concluding these preliminary remarks I wish it to be distinctly understood that I do not mean hereby to cast any aspersion whatever upon the character or reputation of Mr. Caleb Collins, but, upon the contrary, by reading this record, one must conclude that he was a good, just and charitable man; and if Iowa Harrell is deprived of that which she has earned by serving him, then that wrong and injustice cannot be charged up to him, but must be laid at the door of those who are claiming unjustly that which they did not earn.

If we were to ignore the relations that existed between Mr. Collins and the appellant at the time of and prior to the date of the alleged contract, and also disregard the testimony of Mrs. Harrell, Ezekiel Dooley and his wife, Stella Dooley, and consider only the testimony of the remaining witnesses introduced by her, in conjunction with respondent's evidence, then there would be some force and plausibility in that contention, for when thus segregated and considered alone it might look as though he intended to deed her the farm as a voluntary gift or donation; but when we consider the fact that Mr. Collins was not related to appellant, that he had no natural claims upon her; that she owed

him no legal duty to keep house and serve him free of charge; that in the absence of an understanding to the contrary he would have been legally liable to her for all such services she might render unto him; and when we consider the positive and unequivocal testimony of Mrs. Harrell, Mr. and Mrs. Dooley, who above all others ought to have known of the existence of the contract, if it was actually made, instead of looking upon their testimony with suspicion because of the relations existing between them and the appellant, we are of the opinion that such fact should be reckoned in her favor, and we would look upon the contract with much suspicion if the record had disclosed the fact that her mother and near relations had no knowledge of its existence. Of course, and as before stated, that relationship should be considered in weighing their testimony, as in any other case, but should not in the absence of all evidence brand the transaction as a fraudulent conspiracy to rob the estate of Mr. Collins.

When the entire case is thus viewed, the conclusion to our minds seems to be irresistible that the contract stated in the petition was actually entered into by them.

And if we view and weigh the testimony of the other witnesses in the case in connection with and in the light of the above facts, it corroborates and strengthens the position above stated, rather than militates against it, for the reason that it shows that the statements of Mr. Collins made to the various witnesses regarding his intention to deed the farm to Iowa related to and were prompted by his contractual obligation to do so, and not out of a spirit of charity and benevolence entertained by him, and thereby ignore all legal and moral obligations he owed her for the years of care and toil she had so faithfully performed for him. Such a view by Mr. Collins of the situation would have detracted from the merits and virtues of appellant by treating her services as practically worth-

less, when all the evidence is to the contrary; and would brand him as being a penurious, unjust man—designingly accepting her years of faithful toil without compensating her therefor. This idea is also in conflict with all the evidence in the case—in fact, all parties admit that he was a liberal-minded, generous man, upright and just in all of his dealings.

The fact that he had a fixed and definite purpose to deed the farm to her and to will his other property to his kindred indicates that his intention was not to make her a present of the property but that it was his intention to convey it to her in fulfillment of his contract with her. While, upon the other hand, if it had been his intention to make a gift of the farm to her, he would most likely have said that he intended willing it to her, as that was the mode by which he repeatedly expressed his intention of giving away his other property.

We are, therefore, clearly of the opinion that the contract stated in the petition was made and entered into by and between Mr. Collins and appellant, and that it was fully and completely executed on her part, and to deny specific performance of the contract at this time would work irreparable injury to her, deprive her of all compensation for the years of faithful care taken of him, honest services performed in his behalf, and turn that justly earned compensation over to his collateral kindred, who had no moral or equitable claims upon him or his bounty outside of the cold letter of the Statute of Descent and Distribution. Such a descent and distribution of the land in question under the facts and circumstances of this case would be unjust, inequitable and shocking to the mind of the chancellor, and should not be tolerated for a moment.

II. It is next insisted by counsel for appellant that if it be conceded the contract was actually entered into by and between Mr. Collins and Iowa Harrell, still specific performance of the contract should be denied,

for the reason, they contend, that the evidence shows that she violated the provisions of the contract by leaving him and going to Leroy, Kansas, with her mother, and there remaining for three or four months without his consent or permission.

It is a conceded fact that she did leave the home of Mr. Collins in the year 1902 for a period of about four months and resided with her mother during that time in the town of Leroy, Kansas, but why she left and whether it was with or without his permission does not satisfactorily appear from the record.

It is true, one witness for respondents testified that Mr. Collins stated to him, not, however, in the presence or hearing of Iowa or her mother, that he thought they left him for the purpose of compelling him to convey them some of his property, but that he did not propose to do so.

Conceding the competency of that evidence, without deciding it, we are of the opinion that it is entitled to no weight or consideration, for the reason that no such issue was made in the case, and even though it had been made, the undisputed evidence shows that she returned to his home within a few months and resumed her former position and performed the same services without objection on his part from that time until the day of his death, which was in August, 1905.    Under those facts he himself would not be heard to say, after accepting her services for a period of three years or more after her return, that she violated the contract, and on that account she should not be permitted to recover, much less should his collateral heirs be permitted after his death to enter that objection against her right to recover in this case.    Besides all that, Mr. Burchett testified that in a conversation he had with Mr. Collins while appellant and her mother were in Leroy, Kansas, he said that they had advanced schools out there, and that he intended to fix up his business the best he could and go out there and make his home with appel-

lant and her mother.  This evidence was competent and was apparently wholly disinterested.  It shows there was no estrangement existing between them during the period of her absence from home, and strongly indicates that her stay in Kansas was agreeable to him, and that he was going to shortly join them at Leroy. So, if we view this question from any point we may, the evidence shows that it is totally destitute of all merit and should not operate in any manner to bar specific performance of the contract.

III.  Learned counsel for respondents insist and argue with much force and ingenuity that Mrs. Harrell was not a competent witness to testify in the case, for the reason, alleged, that she was a party to the contract, that is, her assent to the contract made between Mr. Collins and her infant daughter was necessary before the contract would have become binding on the latter.  Concede that to be true, then the contract would have been only voidable and not void on account of her infancy, and after she went on and faithfully performed her part of it, it would not now lie in the mouths of respondents, after the contract had been fully executed, to say it was voidable at the time it was entered into, because of her infancy.  That being true, it was wholly immaterial in so far as the binding force of the contract was concerned whether her mother, her natural guardian, assented to the contract or not.

But returning to the question in hand.  There is not a scintilla of evidence in the case which tends to show Mrs. Harrell was a party to the contract, or that she was requested to, or ever gave her assent to her daughter's entering into the contract in question, unless silent acquiescence might be considered such assent; but, however that might be, such assent would not make her a party to the contract in a legal sense.  If so, then all parents would become parties to contracts made by their minor children, provided they knew of

the contract and failed to protest against it. If they protested, of course, such protest would nullify the contract, *ergo* there could be no contract with a minor unless the parent of the child is also a party to it. Such is the logical sequence of counsel's argument, and effectually refutes the soundness thereof.

We must, therefore, hold that Mrs. Harrell was not a party to the contract within the legal signification of those words, and, consequently, that she was a competent witness in the case.

IV. After deferring somewhat to the findings of the trial court in this cause, a careful reading of the evidence and a due consideration thereof have fully convinced us that the findings of the learned court are against the weight of the evidence, as disclosed by the record; and that the judgment rendered thereby in favor of respondents is for the wrong parties, and is against right, justice and equity.

We, therefore, under and by authority of the law as stated in the case of Gibbs v. Haughowout, supra, reverse the judgment of the lower court, and remand the cause with directions to that court to enter a decree in favor of appellant, specifically enforcing the contract stated in her cross-bill according to the prayer thereof.