# JOHANNA C. McQUINN and MARY F. McQUINN v. MICHAEL MOORE et al., Appellants.

### Division Two, December 31, 1909.

1. **EJECTMENT: Legal Title: Oral Contract to Convey: Character of Proof: Instruction.** Where the legal title is clearly in plaintiffs in ejectment, and defendant claims he was placed in possession by the owner (the common source) under an oral contract to the effect that if he would take care of the owner's mother during her life the land would be his, and that he had fully performed, the court properly instructed the jury that the legal title was in plaintiffs and that they were entitled to recover unless defendant had established the making of said contract and his performance thereof, and that "the law is that the proof of such alleged contract must be so clear, cogent and forcible as to leave no doubt whatever in your minds as to its terms and character, and that you be convinced to a moral certainty of the existence and terms of such contract, and that the acts performed by defendant referred to and resulted from the alleged oral contract and are such as would not have been done except on account of that very contract and with a direct view to its performance." This instruction states the law applicable to such a case.

2. ———: ———: ———: ———: ———: **Conflicting For Defendant.** And a like instruction given for defendant without stating the quantum of evidence required to establish said contract, was not in conflict with said instruction.

3. ———: ———: ———: **Equitable Defense: No Affirmative Relief Prayed.** The answer of defendant, in ejectment, setting up a fully performed oral contract to convey, constituted an equitable defense; and the fact that he did not ask for affirmative relief did not change the character of the equitable defense into a strictly legal one, nor did it change the character of the proof essential to establish such defense.

4. ———: ———: ———: **Consistent With Agreement for Free Rent.** Where the testimony of the witnesses, to the effect that the testator stated he would buy the land but defendant must improve it, is just as consistent with the idea that defendant was to have the land free of rent if he would make the improvements and take care of the testator's mother, and after her death for thirteen years the testator leased it by written annual leases to defendant's brothers and received the rent and paid the taxes, and also received one thousand dollars for a

railroad right of way through the land, all with defendant's knowledge and without any protest, and at his death willed it to his nieces, the verdict of the jury finding there was no contract to convey it to defendant upon the death of testator's mother, is amply supported by the evidence. All the acts, of both defendant and the testator, subsequent to the mother's death, are inconsistent with a contract to convey.

5. ————: ————: ————: **Lease: Adverse Possession.** The acceptance of written leases for thirteen years by the owner's brothers and the payment of rents to him is utterly inconsistent with a claim by them of adverse possession against him during those years.

Appeal from Clinton Circuit Court.—*Hon. Alonzo D. Burnes,* Judge.

AFFIRMED.

*E. C. Hall* for appellants.

(1)   Patrick F. Moore was landlord to the other defendants and that relation began in May, 1890. They were his tenants when the leases offered by the plaintiff were made and consequently those leases were not only incompetent as evidence in this case, but were void. Their introduction was very prejudicial to Patrick F. Moore. Walser v. Graham, 45 Mo. App. 629; Higgins v. Turner, 61 Mo. 249; Dausch v. Crane, 109 Mo. 323; Dausch v. Crane, 109 Mo. 335; Taylor on Landlord and Tenant, sec. 629; Myers v. Miller, 55 Mo. App. 347.   (2)   There was no evidence of abandonment by Patrick F. Moore, and the instruction on that question was error. Walser v. Graham, 60 Mo. App. 327.   (3)   The admissions or declarations of a tenant in possession cannot be heard to affect his landlord's title. Mooring v. McBride, 62 Tex. 309.   (4)   Attornment of a tenant to a stranger is made void by section 4112, R. S. 1899, unless it is made with the consent of the landlord. Redmond v. Perkins, 122 Mo. App. 170; Leach v. Koenig, 55 Mo. 451.   (5)   Plaintiffs' first instruction is erroneous in being a mere abstract proposi-

tion of law, not applicable to the facts and misleading and prejudicial in calling special attention to and commenting upon the evidence of the lease from part of the defendants, and in not stating all the law applicable to the facts relating to that particular issue. Strickland v. McCormick, 14 Mo. 166; Hewitt v. Price, 99 Mo. App. 666; Bergeman v. Railroad, 104 Mo. 77. (6) Instruction 9 for plaintiffs is erroneous in stating the rule to be that the proof of an oral contract must be beyond all doubt whatever, and in requiring like proof of performance of the contract. Also inconsistent with instruction 1 given for defendant. Williams v. Watson, 34 Mo. 95; Scott v. Allenbaugh, 50 Mo. App. 130; Chaney v. Phoenix Ins. Co., 62 Mo. App. 45; Grocer Co. v. Sanders, 74 Mo. App. 657; Culbertson v. Hill, 87 Mo. 553; Hoover v. Insurance Co., 93 Mo. App. 111; State v. Herrell, 97 Mo. 105; Standard Oil Co. v. Meyer, 74 Mo. App. 446. (7) There was no evidence of abandonment of the contract by Patrick F. Moore and nothing upon which to base plaintiffs' instruction 10. Chouteau v. Searcy, 8 Mo. 733.

*E. S. McAnany, M. L. Alden* and *Harry T. Herndon* for respondents.

(1) Appellant, Patrick F. Moore, claims that by performing the contract to support the mother of Thomas C. Moore he became the owner of the equitable title to the land in controversy. He had the burden of proving first that such a contract existed, and second that if it existed, he performed it by supporting Mrs. Moore. Both propositions were emphatically controverted by respondents and the evidence was strongly against both. The general verdict was against defendant, "and every fair and reasonable inference of fact which the evidence will bear should be made to support the verdict of a jury." Sappington v. Railroad, 95 Mo. App. 387; Arnold v. Cason, 95 Mo. App. 426. (2) The legal title was in plaintiffs. To overcome this legal

title, the defendant, Patrick Moore, set up an equitable defense which sought to make Thomas C. Moore a trustee for him, holding the legal title. He sought to prove this trust in the teeth of the Statute of Frauds by parol evidence and this after the other party to the alleged contract was dead. The defense, while permitted in an action at law, was equitable, and was to be measured by the standards applicable to equitable actions. The pleadings had to set up facts which would have constituted a defense in equity, and as to what constitutes a preponderance of the evidence should be measured by the rules of equity. This ninth instruction merely informed the jury what, in a case of this kind, would constitute a preponderance of evidence viewed in the light of equity. Adams v. Burns, 96 Mo. 364; Allen v. Logan, 96 Mo. 591; Johnson v. Quarles, 46 Mo. 426; Forrester v. Scoville, 51 Mo. 268; Ringo v. Richardson, 53 Mo. 394; Kennedy v. Kennedy, 57 Mo. 73; Modrell v. Riddle, 82 Mo. 31; Berry v. Hartzell, 91 Mo. 132.

GANTT, P. J.—This is an action of ejectment for the south half of the northeast quarter of section 32, township 57, range 31, in Clinton county, Missouri, less the right of way of the Quincy, Omaha and Kansas City Railroad. All of the defendants, except Patrick Moore, joined in an answer which was a general denial with a further plea that they were in possession of the lands as tenants of Patrick F. Moore. Patrick F. Moore's separate amended answer was, first, a general denial, except that he was in possession of the premises. Second, he alleges that on or about the —— day of February, 1877, Thomas C. Moore, being then and there the owner of the northeast quarter of said section 32, made and entered into a contract with said Patrick Moore, whereby he placed him in possession of the said premises, and agreed to bind himself to convey to said Patrick all of the said land in consideration that the said Patrick would take care of and support Mrs.

Bridget Moore, the mother of said Thomas, for and during her natural life, and the sole ownership and title of said lands at the death of the said Bridget Moore should be conveyed to the said Patrick. That this defendant, Patrick Moore, had fully complied with said agreement and had taken care of said Bridget Moore during the whole of her natural life in compliance with said contract. That said Thomas Moore put this defendant in possession of said lands on the ——— day of February, 1877, and this defendant had remained in the actual possession thereof by himself and his tenants ever since the said date. And the said Thomas C. Moore held the title to said land in trust for this defendant up to the time of his death; that defendant has placed valuable and lasting improvements on said land to the amount of $2,000. In the third and fourth count of the answer, defendant pleads the Statute of Limitation of ten years. The cause was tried to a jury and there was a verdict and judgment for the plaintiffs and from that judgment the defendants have appealed to this court. The instructions will be noted in so far as necessary in the further discussion of the case.

The evidence shows that the plaintiffs are nieces of the Reverend Thomas C. Moore, a Catholic priest, who resided at the date of his death in Kansas City, Kansas. In 1877 the Reverend Thomas C. Moore was living in Kentucky and desired to establish a home for his mother, Bridget Moore. For a number of years he had supported her, but his duties as a priest required him to change his residence from time to time and he became anxious to have his mother settled in the neighborhood in which an older brother, Maurice Moore, lived with his family in Clinton county, Missouri. With this purpose in view Reverend Thomas C. Moore went to Clinton county and purchased 160 acres of land, to-wit, the northeast quarter of section 32, township 57, range 31, for $2,400, and took the title

in his own name.  He paid $600 cash and gave his notes and deed of trust for the remaining $1800.  He finally paid off said encumbrance in 1893.  Maurice Moore, his brother, occupied a farm very near to that purchased by Reverend Moore.  In making the purchase of the land, Patrick F. Moore, his nephew, assisted him, and Patrick Moore assisted by his brothers, Michael and Maurice, broke and cultivated the land which up to that time was raw prairie.  They put a three-board fence around it and built a small two room frame house and a board stable and some out sheds.  In 1878 Mrs. Bridget Moore came to this place and with the exception of a very short interval, lived on it until her death in November, 1890.

The evidence on the part of the defendant, Patrick, was to the effect that the Reverend Thomas C. Moore agreed to give Patrick this land at the death of Mrs. Bridget Moore if he supported her until her death and fulfilled his part of the contract, but this was denied by plaintiffs.  As Thomas C. Moore was dead and Patrick could not testify, several witnesses were produced who detailed casual conversations with the deceased occurring from ten to twenty-nine years previous, which indicated to some extent that there was an agreement, but this testimony was just as consistent with the conclusion that the agreement was that Patrick was to have the place rent-free as long as he supported the old lady.  During most of the time Patrick lived with his grandmother, but for considerable periods his sister Mary Ann or his brother Michael was with her, indeed Maurice Moore's family lived near by and they all contributed to the companionship and care of the old lady.  Prior to Mrs. Moore's death in 1890, the land was worked and used for pasture by the Moore brothers, Patrick F. Moore, Michael and Maurice, Jr., and Frank until the spring of 1890, when Patrick left and went to Colorado and ceased to be a member of the firm.  In 1887 Patrick wrote his uncle,

Reverend Thomas C. Moore, as follows: "Isn't there some institution in which grandmother can be put and taken off my hands, and I will pay you the rent for the farm?" Shortly after writing this letter Patrick brought his grandmother, Mrs. Bridget Moore, to Kansas City, to the home of the Reverend Thomas C. Moore, but she got tired and requested to be taken back to the farm. When Mrs. Moore died on November 2, 1890, the farming year was over. On December 15, 1890, Michael Moore and brothers, except Patrick, entered into a written lease with Thomas C. Moore for $200 cash rent, they to pay the taxes and send him the receipts, and thereafter for twelve years a similar lease was made between these parties, the last one expiring on the 4th of March, 1903. All of these leases contained covenants by Michael Moore and brothers to yield peaceful possession at the expiration thereof to the Reverend Thomas C. Moore and to keep the fences and houses in repair and not to underlet without his permission, nor cut down trees. After Patrick Moore returned from Colorado in 1892, some thirteen years before the death of the Reverend Thomas C. Moore, he remained at the family home of his father Maurice Moore with his brothers. He knew that these brothers were working this farm, and paid him no rent for it and he paid no taxes on it. He talked with the Reverend Thomas C. Moore, on visits which the latter made to Patrick's father's family, about this farm, which he called "Father Moore's farm." He knew that his brothers were paying Father Moore $200 a year rent for the place. In 1893, after the deed of trust for the purchase money was paid off, Maurice Moore, one of the defendants, got a quitclaim deed from the beneficiary, Ann Hamilton, to Thomas C. Moore. In 1896, the Kansas & Northern Connecting Railway, now the Quincy, Omaha and Kansas City Railway, desired a right of way through this land, and James G. Trimble, attorney for said company, inquired of the Moore

brothers as to the residence of Thomas C. Moore; they informed him that they leased the land from Thomas C. Moore and that the latter resided at St. Mary's, Kansas. Mr. Trimble drew a warranty deed for the right of way from Thomas C. Moore, and Michael Moore, one of the brothers, sent it to Thomas C. Moore, who signed and acknowledged the same and returned it to Patrick F. Moore, who in turn handed it to Michael, and on October 7, 1897, Michael delivered it to Mr. Trimble and received one thousand dollars for the right of way, which was sent to Reverend Moore. Reverend Thomas C. Moore died December 28, 1905. His will was probated in Wyandotte county, Kansas, January 5, 1906. He devised the north eighty of said quarter section to Patrick F. Moore, and the south eighty, the land in suit in this action, to the sisters, his nieces, Mary F. McQuinn and Johanna C. McQuinn. Mary McQuinn was at the time of the trial, fifty-four years old, unmarried, sewing and clerking in a store in Kansas City, Missouri. She was housekeeper for her uncle, Reverend Thomas C. Moore, from 1871 to 1878 in Kentucky, and for a number of years in Kansas City she kept house for him and taught his parochial school. Johanna McQuinn, the other plaintiff, was at the date of the trial forty-four years old, unmarried and a copying clerk at Montgomery Ward's. She had been her uncle's housekeeper continuously for twenty years before his death. Four days before he died, the Reverend Thomas C. Moore left written instructions to his niece and executrix, Johanna McQuinn, to collect from Moore brothers $200 rent owing for the farm. This was read to all of the defendants a few days after his death and at that time they made no denial of their liability to him. In the spring of 1905, correspondence was had between the McQuinns and the Moore brothers relative to the possession of this eighty acres of land. In one letter Patrick speaks of "the farm Father Moore had in Missouri," and that Father Moore had

told him before his death that he (Patrick) was to have the one hundred and sixty acres. In another letter he says: "We claim the land." In another letter, he said: "He would buy the land in a compromise rather than to have a suit over it." About August 7, 1905, the plaintiff made written demand for possession of the land of the defendants, and in the conversation participated in by all the defendants, they claimed that the whole quarter section belonged to the Moore brothers, they having paid Thomas C. Moore $2400 for it. Thereupon this suit was filed August 10, 1905. All the defendants joined in an answer claiming that they had acquired title by ten years' adverse possession. But on September 17, 1906, just before the trial of the cause, amended answers were filed, in which Patrick Moore claimed the land by virtue of the contract set up in his amended answer, and the other brothers allege that they were the tenants of Patrick Moore.

The defendants have assigned forty grounds for the reversal of the judgment, but we have gone through these assignments and in our opinion it will be unnecessary to consider each one of them separately.

The case made on the part of the plaintiffs was a straight legal title in the common source of title, the Reverend Thomas C. Moore. The plaintiffs deduce their title to the eighty acres in suit through the last will and testament of the Reverend Thomas C. Moore, and the defendant Patrick Moore, conceding the legal title to have been in the Reverend Thomas C. Moore, seeks to establish a right to the said land by virtue of an alleged contract made by Patrick Moore with the Reverend Thomas C. Moore, by which in consideration of Patrick's support and maintenance of the mother of the Reverend Thomas C. Moore, during her lifetime, the Reverend Moore was to convey said land to the said Patrick. It is plain, therefore, that the plaintiffs were entitled to recover unless Patrick Moore established the making of the said contract and his perform-

ance of the terms thereof, and so the court in its ninth instruction directed the jury, and added "that the law is that the proof of such alleged contract must be so clear, cogent and forcible as to leave no doubt whatever in your minds as to its terms and character, and that you be convinced to a moral certainty of the existence and terms of such contract, and that the acts performed by Patrick Moore referred to and resulted from the alleged oral contract and are such as would not have been done except on account of that very contract and with a direct view to its performance." A like instruction was given for the defendants, without, however, stating to the jury the quantum of evidence required to establish said contract. There is no conflict between the two instructions, that for the plaintiffs supplemented the one for the defendant, but was not in any manner inconsistent with it. It will be noted that the paragraph of the answer setting up this defense constitutes an equitable defense and the burden, of course, was on the defendants to establish it as pleaded. The fact that the defendants did not ask affirmative relief did not change the character of the defense from an equitable one into a strictly legal defense, nor did it change the character of the proof essential to establish such a defense.

It will not be necessary to re-examine the foundations of the doctrine on this subject. In the very recent case of Collins v. Harrell, 219 Mo. 279, the more recent decisions of this court on this subject were collected and followed. Thus it was said: "In Kinney v. Murray, 170 Mo. l. c. 701, the principle governing courts of equity in this class of cases was well stated to be that: 'When, as in this case, and in consonance with this doctrine, a court of equity is called upon to establish and enforce a contract of this character, in the teeth of the Statute of Wills, and of the Statute of Frauds and Perjuries, and to set aside the disposition of valuable property made in conformity with the re-

quirements of those statutes, there is devolved upon the chancellor the gravest responsibility, perhaps, that ever attaches to his high office. And nothing short of the inherent justice of the claim, supported by evidence that can be relied upon with the utmost confidence, proving the existence of the contract, its terms and conditions and a substantial and meritorious compliance therewith, with such certainty and definiteness as to leave no room for reasonable doubt, can ever justify the exercise of such an extraordinary prerogative.' And again it was said: 'But, the proof of such a contract must be so cogent, clear and forcible as to leave no reasonable doubt in the mind of the chancellor as to its terms and character; and where the consideration consists of acts to be performed, there must be like proof that the acts performed refer to and result from that contract, and are such as would not have been done unless on account of that very agreement and with a direct view to its performance. "There must be no equivocation or uncertainty in the case." ' '" To the same effect were cited Rosenwald v. Middlebrook, 188 Mo. 58, and Kirk v. Middlebrook, 201 Mo. l. c. 289, 290.

The jury, thus instructed by the court, found against the defendant on this issue, and the only question before us at this time is whether there was any substantial evidence to sustain their finding. The great mass of testimony offered in support of this equitable defense consisted of casual conversations by which the defendants sought to establish the existence of the contract. Not one of these witnesses attempted to state the contract itself or claims to have been present when it was made. The witness Downey, stated, "Of course, my recollection of everything cannot be clear." And then proceeded to detail statements which he had heard Father Moore make back in the year 1877 and 1878. He said that Father Moore told him that he was out here trying to locate his mother,

provide a home for her; that he wanted to buy a piece
of land for Pat Moore, said Pat could keep her; wanted
to buy a small piece of improved land between Gray-
son and Plattsburg; that he, the witness, and Pat and
Father Moore discussed the expense of improving the
land and building the necessary houses on it, when
Father Moore said, 'I will pay for the land, and that
is more money than I have got, I have only about $2,
000, that is all I can do.' And Pat said he could im-
prove it the next year, but not that year. That Pat
would have all the improving to do.'' He stated that
the substance of Father Moore's talk was that it was
Pat's land and that he (Father Moore) was to pay
for it. He repeated that Father Moore said to Pat,
''I will pay for the land for you, but you must do the
balance and keep the old lady as long as she lives.''
Asked the direct question, ''Who did he say should have
the title of the land at any time?'' this witness an-
swered, ''Well, just as I told you, he said, 'I will pay
for this land for you and that is all that I will do, you
must do the balance and take care of the old lady as
long as she lives,' that is as near as he came to the ti-
tle to the land.''

William Puckett also testified to a declaration
made by Father Moore many years before the trial in
which he said: ''Now the boys have it, and my mother
is well cared for, and if I become old Pat will care for
me.'' And Joseph Puckett testified to a conversation
made some twenty years before the trial in which
Thomas C. Moore said: ''I bought this farm and gave
it to Pat for taking care of my mother.'' Other wit-
nesses spoke of more recent references by the de-
ceased priest to the farm as ''Pat's farm.'' On the
other hand opposed to this loose talk were the actions
of Patrick and Thomas C. Moore. Thomas C. Moore
took his deeds to this land for which he had paid his
money and recorded the same and for twelve or thir-
teen years before his death, rented the same by writ-

ten leases to the brothers of Patrick Moore, with the full knowledge of said Patrick Moore, and paid the taxes on the land, and also took and received the purchase money for the right of way of the railroad through it, with the full knowledge of Patrick Moore and without any objection whatever upon his part. More than that the evidence shows that Patrick Moore took his grandmother down to Kansas City with the view of leaving her there with her son, Reverend Thomas C. Moore, and when she was dissatisfied and came back to Clinton county he left her and went to Colorado and was living there when she died; in fact, did not return for some two years after her death. That the Reverend Thomas C. Moore never considered that he was bound by any contract to convey this land; to Patrick Moore is clear from his uniform course of conduct with regard to the land, renting it, paying taxes upon it, and finally devising it by last will and testament to his nieces, the plaintiffs in this case. It is perfectly consistent with all that was proven by the defendants that Father Moore considered that in providing Patrick Moore with the use of the one hundred and sixty acres of valuable real estate in Clinton county free of rent in consideration that he would furnish his grandmother a home with him, he was doing a generous part by him and paying him handsomely for any trouble that his grandmother might be to him without ever thinking that he must give him the fee simple title to the farm. Indeed, one cannot read the answers of these defendants without being struck with the inconsistency of these parties. The other defendants claimed that they had paid for the land in twelve equal installments of $200 each, and if so, Patrick had no share whatever in it, but this claim is equally unfounded because it is contradicted by the unequivocal proof to the contrary, in that, they took written leases each year of the twelve years at $200 per year, and their arrangements with their uncle were not a matter of loose ver-

bal statements but of solemn written instruments. In
our opinion there was ample testimony to justify the
jury in finding that there was no such contract made
as set up in the answer of Patrick Moore, and the in-
structions on that point are not open to any fair crit-
icism. The court submitted the question of adverse
possession and the Statute of Limitation of ten years
to the jury in instructions for both the plaintiffs
and the defendants. In their answer the other defend-
ants asserted that they were in possession only
as tenants of Patrick Moore although in a pre-
vious answer they alleged that they themselves
had acquired title by ten years' adverse possession.
It was claimed by Patrick Moore that he was
landlord of his brothers beginning May, 1890;
but this fact was disputed by the plaintiffs and
submitted to the jury, and while these brothers attempt-
ed to establish that they were the tenants of Patrick
Moore, their written leases for twelve years from
Thomas C. Moore and the payment to him of the rent
for all that time with the full knowledge of Patrick,
made it an easy matter for the jury to determine that
point against Patrick Moore's contention. Their leas-
es were a complete refutation of the testimony of Mich-
ael and Maurice to the effect that they were not their
uncle's tenants. It would be hard to conceive of a
jury finding this issue otherwise than they did under
the testimony developed in this case. As already said
we have gone through the various objections to the tes-
timony and the other assignments of error set out at
great length in the motion for new trial and the brief of
counsel, but after all the case turned on the existence
of the alleged contract between Rev. Thomas C. Moore
and Patrick F. Moore and possession under it and the
case was submitted to the jury very fairly for the de-
fendants and the jury found the facts against them.

225 Sup—4

It is significant that no relative of Father Moore outside of Patrick Moore and his brothers, gave any testimony to support his claim of such a contract and there was not the slightest written testimony that indicated the existence of such an agreement. It is utterly unreasonable that Patrick Moore, if he had such a contract with Father Moore, should have stood by for thirteen years after his return from Colorado and after the death of his grandmother and permitted his uncle, Father Moore, to openly rent this farm to Patrick's brothers and take and receive the rents therefrom, as well as a thousand dollars purchase money for the right of way through it, without having entered any protest or made any claim under his alleged contract. His conduct completely negatives the existence of any such a contract to any reasonable mind. As we have already said we have considered all the technical objections to the admissibility and rejection of testimony and otherwise, but in our opinion no good purpose can be subserved by extending this opinion into a discussion of each one of these points separately. None of them are sufficient to constitute reversible error and the verdict of the jury has foreclosed the case on the main issues involved in the case and the judgment of the circuit court should be and is affirmed.

*Burgess* and *Fox, JJ.,* concur.